No. 13522

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

ROBERT DEE CLOSE,
a/k/a BOBBY DEE CLOSE,

Defendant and Appellant.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowtone.
Honorable Robert H. Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Terence M. Swift argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Sheri Sprigg argued, Assistant Attorney General,
Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Charles Bradley argued, Deputy County Attorney, Billings,
Montana

Submitted: November 26, 1980

Decided: FEB 9 - 1981

Filed: FEB 9 - 1981

Thomas J. Kearney
_____ Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment entered on a jury verdict in the Thirteenth Judicial District, Yellowstone County, Montana. On June 3, 1976, the jury found defendant guilty of the following crimes, all arising out of one incident: Count I, deliberate homicide, section 45-5-102, MCA; Count II, aggravated kidnapping, section 45-5-303, MCA; and Count III, robbery, section 45-5-401, MCA. On June 10, 1976, the court sentenced defendant to one hundred years pursuant to the verdict in Count I; forty years pursuant to Count III; and death by hanging pursuant to Count II. In addition, the sentences pronounced on Counts I and III were ordered to be served consecutively.

In May 1979 this Court ordered the District Court to resentence defendant for his conviction of aggravated kidnapping (Count II) for the reason that the sentencing provision under that statute was found to be unconstitutional. The District Court complied and resentenced defendant, under Count II only, to the term of fifty years to be served concurrently with the previous sentences of forty years and one hundred years.

On July 7, 1974, a carnival promoter named Billy Joe Hill drove to Billings, Montana, in a 1968 white-colored, four-door Cadillac sedan. At the time he was carrying between $1200 and $1400 in cash.

Hill was observed in the Rainbow Bar from 9:30 a.m. until 7:00 p.m. on July 8, 1974, by Frank Pirtz, the owner of the bar. That afternoon he was observed with several Indians, a sheepherder and a younger, "cowboy-type" man. Hill kept flashing a large roll of money and did so to such

-2-

an extent that Pirtz cautioned him to stop. Hill left the Rainbow Bar by himself at approximately 7:00 p.m. The "cowboy-type" young man with him apparently had left the saloon about 4:00 p.m.

Between 8:00 to 9:00 p.m. on July 8, two men came into the Silver Dollar Bar. The bartender testified that the older of the two men had on cranberry-colored trousers and a matching shirt. She identified a picture of Hill as this man. The younger man's shirt was hanging out, he looked like a cowboy and wore either a black or dark brown hat. The bartender identified defendant in the courtroom as the younger man. She testified that the two men remained in the bar for about two hours and then left together.

The bartender further testified that the younger man made two telephone calls while in the bar. The bartender later furnished a description of the younger man to the police from which a composite drawing of the suspected murderer was made by a police officer.

Hill's car was observed by Deputy Sheriff Dean Mahlum at about 9:45 p.m. near the Silver Dollar Bar with two occupants. Mahlum described the two occupants of the white Cadillac as follows:

> "The driver of the vehicle was approximately 23 to 24 years of age, 5'10" to 5'11" tall, 165 to 170 pounds. He was wearing a felt type cowboy hat, either dark brown or black, the brim was rolled in on it. He had a light colored shirt which was unbuttoned down the front and also pulled out of his pants. I believe he had on blue jeans and boots. The other subject was an older gentleman. I didn't get as good a look at this gentleman. He had on a light colored shirt, maroon pants, boots, and also a white hat, western type."

According to the bartender, Hill returned to the Silver Dollar Bar alone at approximately 1:45 a.m. on July 9. He

stood at the bar and ordered a can of beer. He took only about three drinks of the beer and walked out.

At about 7:30 a.m. on July 9, Randall Groom discovered the body of a man lying on the ground near a white Cadillac. He walked close to the body, then got back into his pickup and went home where he called the Yellowstone County sheriff's office at about 8:00 a.m. Groom waited a few minutes and then drove back to the scene. When he arrived, a deputy sheriff had already arrived.

The victim was later identified as Billy Joe Hill. No money was recovered from his personal possession.

Randall Groom testified that he discovered the body while exercising his dog. He stated that he went to this area quite often to exercise his dog, even though it is about three miles from his home. Randall Groom is the stepfather of Ed Close, the State's main witness. He adamantly denied, however, that his stepson had called him that morning, even though Ed Close lived just down the road from where the body was found. Groom stated that it was months after the murder that he first learned that his stepson knew anything about the crime. He testified that his stepson's knowledge of the facts surrounding this offense were first discovered by him about one month before trial.

An autopsy was performed by Dr. Gordon Cox, a Billings pathologist. Dr. Cox testified that the victim died from multiple severe blows to the head, both front and back, with resulting brain damage. He testified the wounds to the deceased's head were inflicted, in his opinion, by a long, relatively narrow, blunt object.

Dr. Cox further testified that from photographs, two of which were photographs of the deceased's car taken outside

-4-

his presence, he concluded that the deceased was sitting in the passenger side of the automobile when the injuries to the front of the head were inflicted.

The thrust of the State's case was that Billy Joe Hill was robbed of the money he was carrying and later killed by defendant, Bobby Dee Close. The State's main witnesses were Ed Close and his wife, Joyce.

Ed Close is the stepson of Randall Groom and a cousin of defendant. The essence of his testimony was that he attended a family picnic near Big Timber, Montana, on July 4, 1974. This picnic was also attended by David Close, the second defendant in this matter and the uncle of Ed Close and the defendant. Ed testified that at this picnic, David Close used a pick to assist a vehicle across a dry creek bed and broke the handle near the pick head. After breaking the pick handle, David tossed it into the back of a pickup owned and driven by Ed. Defendant Bobby Close did not attend this picnic.

Upon returning to Billings after the picnic, Ed drove to David's house and unloaded David's belongings. Ed could not remember if the broken pick handle was unloaded at David's house; however, he found the metal pick head in his pickup when he got home. He removed it from the truck and put it in a box of junk in his garage. The pick head was later delivered to authorities in February 1976.

Ed Close testified that he had certain conversations with defendant regarding the death of Hill. The first such conversation occurred at his house when defendant told Ed and his wife Joyce as follows:

> "A. Well, he told me that he run across this
> guy on the south side, he had a lot of money,
> throwing it around, buying everybody drinks,

and that he had devised some kind of a plan with Uncle Dave to get his money. And they, Bobby and the man, went to different bars around town drinking and they wound up down by the river and that Uncle Dave was there and Uncle Dave give him this club and says, 'Here, Bobby, this is your trick, you do it.' Bobby told me he hit the man once and the man woke up and wanted to know what was going on and Bobby got scared, Uncle Dave took the club and finished it.

"Q. Did he, and referring to Mr. Hill, did he use any name or job occupation? A. I think he talked about him as a carnival worker."

Ed went on to testify that at a subsequent conversation defendant stated, "they would never find it," meaning the club which was used as a murder weapon.

A second conversation took place at David Close's birthday party on July 12, 1974. Ed testified that at the birthday party at David's home the club was mentioned again. According to Ed Close:

"A. Well, Bobby had quite a bit to drink and he had been outside and he come in with a, I don't know, a jug or a bottle of some kind and broke it over the table. Of course glass flew every direction and the wife and Sharon were trying to clean it up and Uncle Dave got mad and went in the bedroom and come out with this piece of a club and shook it at Bobby and asked him if he would like some of this?

"Q. He asked him if he would like some of that, and what did Bobby Dee say or do? A. I don't think Bobby said anything."

Ed Close testified that he managed to get the club from David and took it home with him. He burned it the next morning because he suspected that it was the club used in the murder. At trial he compared the club he took from David to two pick handles, introduced for demonstrative purposes only, and stated they were similar except the one taken from David was older and weatherbeaten.

-6-

On cross-examination, Ed Close admitted that he was first interrogated by law enforcement officers during the summer of 1974 and told Officer Skillen he knew nothing of the crime. Later, Ed was put under oath and sworn statements were given to the county attorney.

Joyce Close, Ed's wife, testified that she was first questioned by law enforcement personnel in February 1976. At first, Joyce denied she had any knowledge of the crime and she was questioned separately from her husband. She was later placed under oath and gave the statement incriminating defendant.

Joyce described the picnic on the 4th of July and her observation of a pick and pick handle. She also testified that she had attended the birthday party on July 12, and that a conversation, prior to the party, had occurred. She stated in detail what was said by defendant during the conversation at trial:

> "Q. What did the defendant, Bobby Dee Close, say to you at that time? A. He said he was in the Standard Bar drinking, and he had run across this man that was also in the Standard, and this man had a lot of money, he was buying the bar drinks. In fact he had a roll of money that he threw at a prostitute down there in the Standard. She picked it up and threw it back at him and said that money is going to get your throat cut. And Bobby said that he went to the phone, called his uncle, David Close, and that he had went with this man to a couple other bars, the Crystal, I believe he mentioned, and the Silver Dollar, and then went on out to the gravel pits. When he was out to the gravel pits, Dave was there. Bobby hit the man over the eye and the man woke up, put his hands up like, 'What's going on?' and Bobby got scared and that was when his uncle took over, Dave. Well, before that, when he went out to the gravel pits and Dave was there, Dave handed him a club and said, 'Bobby, this is your trick, do your thing.' And that's when Bobby hit him over the eye and the man had woke up and tried to protect himself and then Bobby got scared and that's when Dave took over.

"Q. But he did say he struck the man, right?
A. Yes, he hit him over the eye.

"Q. Did he tell you how many times he struck him over the eye? A. One time."

Joyce further testified that an argument developed at the birthday party between David Close and defendant. During the argument David went into the bedroom and came back with a club, held it up, shook it at defendant, and said, "Do you want some of this too?" David's wife told Ed to get the club and do something with it. Ed got the club, took it outside and put it in his pickup truck.

Joyce went on to testify that defendant at the first conversation told her that David Close had hit the victim in the back of the head when he "took over."

Expert witnesses testified at trial that defendant's fingerprints were found both inside and outside the victim's car. One of them, a print of defendant's left thumb, was found on the inside rear of the left rear door window of the victim's car. One of the fingerprint experts testified on rebuttal that the print was of the inside of the left thumb, toward the fingers. (Defendant is left handed.) The door on which that print appeared was partially unlatched when the victim's body was found.

There was also testimony concerning defendant's statements to law enforcement authorities before he became a suspect in the case. About six weeks after the crime, on August 26, 1974, he spoke with Officer Skillen, who testified:

> "He said that he had been in the bars on the
> south side, he thought that he had seen the
> person described as the victim. He mentioned
> seeing the victim with a man with a beard and
> he said the last time he saw him he was in the
> company of some colored people."

After his arrest on February 27, 1976, defendant told the authorities that he had left Hill in his car on the night of the crime.

Defendant was the only defense witness. He testified that he had met Hill for the first time at about 3:00 or 4:00 p.m., on July 8, 1974, in the Rainbow Bar. Defendant remained there for about thirty-five to forty minutes. Defendant met Hill again some time later that evening in a bar near the Greyhound Bus Depot. Hill came in with two other men sometime between 4:00 and 5:00 p.m. Hill remained at this bar for approximately an hour, apparently drinking beer and playing pool. Hill and defendant left this bar together and went to several other bars on the south side of Billings. They drove to these bars in the deceased's automobile, with defendant driving and Hill sitting in the front passenger seat. Defendant testified that Hill could walk, but he was intoxicated.

According to defendant they remained at the Standard Bar for two and one-half to three hours. Defendant and Hill left the Standard Bar and drove in the deceased's automobile to the Silver Dollar Bar. Defendant again drove with Hill still occupying the right front seat. The deceased was able to get into the car by himself.

They parked Hill's car near the Silver Dollar Bar and drank beer there for one to two hours. At this time, defendant testified that he (defendant) was "pretty intoxicated." When they left the Silver Dollar Bar, defendant helped Hill into his car by placing him in the passenger side. Defendant testified that this was the last time he saw Hill, who apparently had passed out in the front seat of his car.

-9-

Defendant stated he did not drive to the gravel pit area where Hill's body was found and he did not rob or strike the deceased.

Defendant also testified that he did not attend the 4th of July picnic; that he never saw a pick handle such as the one that was demonstrated in the courtroom. He denied Ed and Joyce Close's testimony regarding the statements which they alleged he had made to them regarding the homicide. He did admit attending the birthday party on July 12, 1974, and fighting with his Uncle David. He stated that David Close had threatened him with a handle from a bathroom plunger.

## Claim for Mistrial

The first issue defendant raises is whether the District Court abused its discretion in finding that a mistrial was not manifestly necessary when a prosecution witness flashed photographs before the jury which were later not admitted.

The State's first witness was Dr. Gordon Cox, a Billings pathologist. Dr. Cox performed the autopsy on Hill and testified about the cause of death. The State moved to have certain photographs of the body admitted into evidence during Dr. Cox's testimony, and defense counsel voir dired. On voir dire cross-examination, the State asked Dr. Cox to identify for the record those photos which would assist the jury in understanding his testimony and findings. The pathologist replied, "[t]his one I think, definitely," at which point defendant's counsel objected, stating, ". . . I move for mistrial on behalf of the defendant for these pictures have been repeatedly flashed before the eyes of the jury . . ." The court overruled this motion and continued the trial.

The court correctly denied the motion for mistrial.

The test for declaring a mistrial was stated by the United

States Supreme Court in United States v. Perez (1824), 22

U.S. (9 Wheat.) 579, 580:

> ". . . the law has invested Courts of justice
> with the authority to discharge a jury from
> giving any verdict, whenever, in their opinion,
> taking all the circumstances into consideration,
> there is a manifest necessity for the act, or
> the ends of public justice would otherwise be
> defeated. They are to exercise a sound discre-
> tion on the subject; and it is impossible to
> define all the circumstances, which would render
> it proper to interfere. To be sure, the power
> ought to be used with the greatest caution,
> under urgent circumstances, and for very plain
> and obvious causes; . . ."

The trial court judge is in the best position to

determine with certainty whether the pathologist's handling

of the exhibit actually exposed it to the jury in such a

manner as to require a mistrial. Our function on appeal is

to determine whether the trial court abused its discretion

in not granting a mistrial. United States v. Jorn (1971),

400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543.

The District Court, having observed the event and the

reaction of the jurors, and being the judge most familiar

with the evidence and the background of the case ". . . is

far more 'conversant with the factors relevant to the deter-

mination' than any reviewing court can possibly be."

Arizona v. Washington (1978), 434 U.S. 497, 514, 98 S.Ct.

824, 834, 54 L.Ed.2d 717, 733.

Prejudicial error was not shown. The photographs

involved are not large blow-ups; they are normal snapshots.

It is unlikely that such brief exposure to such small photo-

graphs in the hands of a witness on the stand could have

such an impact as to require a mistrial. Also, the photo-

graphs at issue are not significantly different from those

which were admitted. Furthermore, The judge gave the jury appropriate cautionary instructions. See Arizona v. Washington, supra.

There was no manifest necessity to order a mistrial, and the ends of public justice were not defeated by carrying the trial to a final verdict. We find no error.

Expert Testimony

Next defendant contends the District Court abused its discretion in overruling his objection to testimony of the pathologist expressing his opinion as to how the fatal blows were applied. Defendant contends the court erred in not sustaining his objection because the pathologist's conclusion was based on photographs taken of the automobile outside the pathologist's presence.

"This Court is not obligated to refute all . . . alleged errors where the errors are bald assertions, absent any specific argument or authority . . ." McGuinn v. State (1978), 177 Mont. 215, 581 P.2d 417, 420, 35 St.Rep. 871. Rule 702, Mont.R.Evid., states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

". . . The competency of a witness to testify as an expert is a question for the trial court's discretion. . ." State v. Paulson (1975), 167 Mont. 310, 538 P.2d 339, 342-343. The court in the instant case did not abuse its discretion. A medical doctor has special knowledge regarding anatomy and injuries to the human body that qualifies him or her to give an opinion as to the cause of the injuries. State v. Campbell (1965), 146 Mont. 251, 405 P.2d 978.

Dr. Cox was exceptionally qualified to give such an opinion. He was a pathologist, a specialist in the study of cause of death. In twelve years as a pathologist, he had performed about 600 autopsies, surgical procedures conducted primarily to determine the cause of death. He had the knowledge, skill, experience, training and education to qualify him to express an opinion as to how the fatal blows were inflicted on the victim from his actual observations, photographs and other tests.

The District Court did not abuse its discretion in allowing the pathologist to testify and express his opinion.

## Witness Identification

The bartender at the Silver Dollar Bar testified on behalf of the State. She stated that the victim and defendant had spent a couple of hours in the bar on the evening of the victim's death. Defendant objects, for the first time on appeal, to the witness's in-court identification of him.

Defendant's failure to object at trial precludes him from now predicating error on the admission of this evidence. Rule 103(a)(1), Mont.R.Evid.; State v. Sullivan (1979), _____ Mont. _____, 595 P.2d 372, 36 St.Rep. 936. Further, upon complete review of the record we find no plain error that substantially affected the rights of defendant.

## Counsel Misconduct During Trial

While cross-examining a prosecution witness, defense counsel pursued the following line of questioning which resulted in a colloquy between counsel:

"Q. I don't ask this question in a critical vein, Mr. Close, but you have been drinking before you came here to testify this morning, isn't that correct? A. No.

"Q. You haven't had a drink this morning? A. Nothing other than coffee.

"Q. Would you care to walk over in front of the Jurors and allow them to smell your breath? A. Yes.

"Q. Would you do that please?

"(Witness complying.)

"Q. Would you breathe out in the presence of the Jurors? A. Yes, I did.

"Q. Would you also go down by this end of the jury box and breathe to the man sitting in the end of the jury box?

"MR. BRADLEY: Your Honor, I am going to object to this demonstration.

"THE COURT: Sustained.

"MR. WHALEN: In view of the answer, it goes to the credibility of the witness and should be allowed.

"MR. BRADLEY: Have you been drinking this morning, Mr. Whalen?

"MR. WHALEN: I haven't, Mr. Bradley.

"MR. BRADLEY: Would you mind going up and breathing to the Jury?

"MR. WHALEN: I will be glad to do so.

"THE COURT: Now, let's desist.

"MR. WHALEN: I have no further questions."

Defendant raises the issue of whether the District Court properly handled this exchange, and, if there was any irregularity, whether it affected defendant's substantial rights.

Defendant contends the court erred in not cautioning the jury with respect to alleged prejudicial comments of the prosecuting attorney. He argues that this exchange of words tended to reflect improperly upon defense counsel, his

methods, tact and procedure. This, in turn, inured to the detriment of defendant. We disagree.

The prosecutor's questions were totally unrelated to the defendant's guilt. They were merely a reaction to defense counsel's persistent line of questioning and were asked to demonstrate that defense counsel's questions could have been personally humiliating to the witness. ". . . It has generally been held that an appellant may not predicate error upon the prosecuting attorney's actions where such was induced or provoked by the appellant's counsel. . ." State v. Gall (1959), 135 Mont. 131, 134, 337 P.2d 932.

Further, defense counsel failed to offer an appropriate cautionary instruction as required by section 46-16-401(4)(a), MCA, and the general instructions given to the jury were sufficient to cure any possible prejudice.

The trial court properly handled the situation by simply ending the exchange. Any irregularity in this event did not affect defendant's substantial rights and must be disregarded.

Chain of Evidence Rule

Defendant contends the District Court erred in admitting into evidence fingerprints and fingerprint testimony which allegedly was not secure from alteration or tampering prior to and during the trial.

Defendant contends his conviction should be reversed because there "could have been" a master key that "could have been" used to obtain access to fingerprint evidence that was locked in the desk of a deputy sheriff. He argues the State failed to establish that the evidence had not been tampered with.

The general rule concerning chain of evidence founda-
tion is this:

> "The State must identify the particular exhibit
> as relevant to the criminal charge and must show
> prima facie that no alteration or tampering with
> the exhibit has occurred . . . Once that has
> been done, the burden of proving alteration
> shifts to appellant. . ." State v. Burtchett
> (1974), 165 Mont. 280, 287, 530 P.2d 471, 475.
> (Emphasis added.)

Burtchett is analogous to this case. There, the defen-
dant argued on appeal that the fact that several people had
access to a forensic laboratory destroyed the custodial
chain. This Court rejected that argument, finding the
testimony of one of the chemists in the lab, to the effect
that the evidence had been kept in the evidence room of the
lab, was sufficient to establish the state's prima facie
case. Similarly, in the present case, the deputy sheriff's
testimony was sufficient to meet the prima facie test, as
the record indicates. The burden shifted to defendant, who
failed to show in any respect that the evidence was altered
or tampered. No error.


Exclusion of Witnesses from the Courtroom

Defendant argues the District Court erred in allowing a
police officer to testify as a rebuttal witness after the
same police officer violated a rule excluding witnesses from
the courtroom and heard defendant's testimony.

Rebuttal witnesses are not within the rule governing
exclusion of sworn witnesses from the courtroom during
taking of testimony. Sutterfield v. State (Okl. 1971), 489
P.2d 1345.


Demonstrative Evidence

Defendant contends the District Court abused its discre-
tion in permitting the admission of demonstrative evidence
into the trial.

-16-

The State introduced six items for demonstrative purposes only: two pieces of a wooden handle and parts of an automobile--a car door, a steering wheel on a drive shaft, a door knob on the car door, and a gear shift knob on the steering wheel.

Defendant contends the District Court erred (1) in allowing these exhibits to be admitted; (2) in failing to give a cautionary jury instruction that this evidence was for demonstrative purposes only; and (3) in failing to further point out in detail all changes between the exhibits and the original items.

"Generally, allowing demonstrative evidence is within the discretion of the trial judge, and is subject to review only upon a showing of a manifest abuse of discretion. . ." Brown v. North Am. Mfg. Co. (1978), 176 Mont. 98, 576 P.2d 711, 722.

An examination of the record in this case shows no abuse of discretion. The testimony of witnesses and comments of both attorneys and the trial judge made clear to the jury that the items admitted were demonstrative only and were not the actual items used in the commission of the crime.

Further, defendant offered no cautionary instruction concerning the demonstrative evidence. He cannot claim error on appeal because none was given. See section 46-16-401(4)(a), MCA. We find no error.

Doctrine of Cumulative Error

Defendant alleges substantial errors were committed by the trial court with regard to the instructions and procedure during the trial. These errors in total constitute cumulative error and have seriously prejudiced defendant, according to defendant.

-17-

The "doctrine of cumulative error" exists in Montana. Cumulative error refers to a number of errors which prejudice defendant's right to a fair trial. State v. McKenzie (1978), 177 Mont. 280, 581 P.2d 1205, 35 St.Rep. 759.

After a complete review of the record and applying the doctrine, we find here no prejudicial error affecting the substantial rights of defendant.

## Merger of Felonies

Defendant next contends that his conviction for aggravated kidnapping and robbery must be vacated because these offenses were merged for purposes of punishment with the felony murder offense. This merger, therefore, violates the double jeopardy clause. We find no justification in defendant's argument. The issue presented here is merely one of statutory interpretation.

The double jeopardy clause protects against both multiple prosecutions and multiple punishments imposed at a single prosecution for the same offense. See North Carolina v. Pearce (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656. The test for determining what constitutes the same offense differs depending on whether the case involves multiple prosecutions or multiple punishments imposed at a single prosecution. The standard is broader in cases involving multiple prosecutions. Two statutory crimes that constitute "the same offense" for purposes of multiple prosecutions do not necessarily constitute "the same offense" for purposes of multiple punishments. See Brown v. Ohio (1977), 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187.

In the instant case, defendant was tried at a single prosecution for all the statutory crimes in question. The

issue, then, is not one of multiple prosecutions but of multiple punishments. The issue is whether, under Montana's statutory scheme, a defendant may be punished for both felony homicide and the underlying felony. The relevant crimes and statutes are deliberate homicide, section 45-5-102, MCA; robbery, section 45-5-401, MCA; aggravated kidnapping, section 45-5-303, MCA; and sections 46-11-501 and -502, MCA, multiple charges and prosecutions statutes.

A traditional test for determining whether two statutory crimes constitute "the same offense" for purposes of multiple punishments was set forth in Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306.

> ". . . The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . ."

In Whalen v. United States (1980), 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715, the United States Supreme Court clarified the applicability of this rule. The rule is not always dispositive on questions of double jeopardy for purposes of multiple punishments. The dispositive question is whether the legislature intended to provide for multiple punishments. The Blockburger test is merely one rule of statutory construction to aid in the determination of legislative intent. The ultimate question remains one of legislative intent. Whalen, supra. The double jeopardy clause ". . . serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense. . ." Brown v. Ohio, 432 U.S. at 165.

Having determined that this case turns on the permissibility of multiple punishments imposed at a single criminal proceeding, we find that the dispositive issue is whether the Montana legislature intended to allow a defendant to be punished for both felony homicide under section 45-5-102(1)(b), MCA, for robbery under section 45-5-401(1)(a), MCA, and for aggravated kidnapping under section 45-5-303(1)(b), MCA, where robbery and aggravated kidnapping were the underlying felonies in the felony homicide.

Specifically, the question confronting this Court is whether the Montana legislature intended to authorize cumulative punishments for aggravated kidnapping, robbery and felony murder based on one of the other prior statutes. This is a matter of statutory construction and does not concern a constitutional question. Whalen, supra, (Rehnquist, J., dissenting). We find that the majority opinion in Whalen does not apply to this case.

There are several bases for finding that the legislature did not intend to preclude punishment for both felony homicide and, in this case, the underlying felonies of robbery and aggravated kidnapping in enacting the felony murder statute.

First, application of the Blockburger test to the statutes involved does not result in the conclusion that the offenses of robbery and aggravated kidnapping are the "same offense" as felony homicide. Blockburger's analysis must stand or fall on the working of the statutes alone, not on the indictment. Whalen, 100 S.Ct. at 1448 (Rehnquist, J., dissenting). Looking at the statutes, then, it is clear that proof of felony homicide will not necessarily require proof of either robbery or aggravated kidnapping. One can

commit felony homicide without committing robbery, or commit aggravated kidnapping without committing felony homicide. Thus, Blockburger does not require the conclusion that felony homicide and the underlying felony merge.

Section 46-11-502, MCA, is merely a codification of the Blockburger test. See State v. Coleman (1979), ___ Mont. ____, 605 P.2d 1000, 1009-1010, 36 St.Rep. 1134, cert. denied, 100 S.Ct. 2952.

The second basis for finding no merger is the history and purpose of the felony homicide provision. The history of the common law and the purpose behind laws are both important tools to be used to determine legislative intent. Whalen, 100 S.Ct. at 1449 (Rehnquist, J., dissenting). The analysis of then Chief Judge Bazelon in United States v. Greene (1973), 160 U.S.App.D.C. 21, 44-45, 489 F.2d 1145, 1168-1169, is persuasive in this regard:

> ". . . At common law, homicides were divided into two categories, murder and manslaughter, with murder requiring a showing of 'malice.' Any homicide committed in the course of a felony was considered murder because malice could be implied from the commission of the felony. When homicides were further subdivided by statute into first degree murder, second degree murder and manslaughter, the doctrine of felony murder was preserved, and the underlying felony was viewed as providing the 'premeditation' and 'deliberation' otherwise required for first degree murder, as well as malice, where necessary.

> "Given this rationale for the felony murder doctrine, it strains credulity to hold that the underlying felony merges into the felony murder. The statute proscribing the underlying felony--robbery, for example--is designed to protect a wholly different societal interest from the felony murder statute, which is intended to protect against homicide. The underlying felony is an essential element of felony murder only because without it the homicide might be second degree murder or manslaughter. Clearly, neither manslaughter nor second degree murder merges with any other felony like robbery or assisting a prisoner to escape."

Third, the legislature found that the homicidal risk is greater when there is a commission of a felony and that the protection of the person from this increased risk warranted additional sentences. The Criminal Law Commission Comment, on which the legislature relied in enacting section 94-5-102, R.C.M. 1947, now section 45-5-102, MCA, stated:

> "Section [45-5-102, MCA] relates only to conduct which is done deliberately; that is, purposely or knowingly. The enumerated offenses in subsection (b) broaden the old law dealing with felony-murders, R.C.M. 1947, section 94-2503, to include any felony which involves force or violence against an individual. Since such offenses are usually coincident with an extremely high homicidal risk, a homicide which occurs during their commission can be considered a deliberate homicide. The section is intended to encompass most homicides traditionally designated as second-degree murder. Subsection (2) changes the punishment, providing that a person 'shall be punished by death . . . or by imprisonment . . . for any term not to exceed one hundred (100) years,' thus seeking to expand the sentencing latitude of the judge."

Clearly, the legislature properly allowed and broadened the law relating to cumulative sentencing in felony murder cases. The enactment of the felony murder rule is supported by appropriate references to legislative history, the trend to encompass the felony murder rule and the desire of the legislature to prevent the commission of these types of dangerous crimes. The legislature allowed it, and the court imposed it. There are no issues other than those.

If a defendant wants to commit a felony, he must pay a price. If a defendant wants to commit murder in addition to the felony or in the course of committing another felony, he must pay a higher price. The legislature manifested a clear intention to serve these two different interests in enacting the statutes.

Errors Committed With Regard To Instructions

Defendant raises alleged errors committed by the District Court with respect to the instructions given and refused.

Defendant did not raise any objection to amended Instruction No. 1, nor objected either to the giving of Instruction No. 1 insofar as it relates to the definition of robbery nor to the refusal of State's offered Instruction No. 26, defining "bodily injury." He cannot now object on appeal. See sections 46-16-401(4)(b) and 46-20-701, MCA; McGuinn v. State, supra.

Neither did defendant raise the issue of lack of sufficient evidence of bodily injury inflicted in the course of the theft. He is likewise precluded from now raising that issue on appeal. See State v. Armstrong (1977), 172 Mont. 552, 562 P.2d 1129.

Further, testimony supports the conclusion that the infliction of bodily injury was an integral part of carrying out the plan to get the victim's money. It meets the required legal minimum evidence to support the jury's factual finding, when viewed in the light most favorable to the State.

Defendant failed to object to Instructions 2, 16 and 32, and, in the case of No. 16 actually concurred in the request; therefore, these instructions are not reviewable on appeal. Further, review of these instructions fails to demonstrate any error.

Defendant contends the court erred in giving Instruction 14 for it does not allow the jury to consider voluntary intoxication in defendant's behalf and irresistible impulse or diminished capacity due to voluntary intoxication were effectively removed from the jury's consideration.

Instruction 14 does not, as defendant contends, "inform the jury that the intoxication may not be considered if it is voluntarily induced." It stated specifically: "An intoxicated or drugged condition may be taken into consideration in determining the existence of a mental state which is an element of the offense." That sentence was added to the offered instruction to meet defendant's objection that voluntary intoxication could eliminate criminal responsibility if it rendered a defendant incapable of forming a necessary mental state. We find no merit in defendant's argument.

Next, Instruction 18 does not, as defendant contends, "inform the jury that defendant, having voluntarily stopped his efforts toward the commission of any of the charged offenses, was under a duty to stop the uncle from perpetrating them." It merely states that if the law does impose a duty which a person is capable of performing, failure to carry out that duty may be a voluntary act. It does not impose any duty.

Defendant challenges three instructions regarding proof of knowledge and purpose on the basis of Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39.

The challenge, even if it were reviewable, has no merit. The same challenge was made about substantially the same instuction in State v. Sunday (1980), ____ Mont. ____, 609 P.2d 1188, 37 St.Rep. 561, and was rejected.

Furthermore, this challenge was not made in the District Court so the issue is not reviewable on appeal. See sections 46-16-401(4)(b) and 46-20-701, MCA; McGuinn v. State, supra; State v. Armstrong, supra.

-24-

Defendant claims the court erred in giving Instruction 26, defining "knowingly," and Instruction 27, defining "purposely." The second sentence of Instruction 26 states:

> "When Knowledge of the existence of a particular fact is an element of an offense, such Knowledge is established if a person is aware of a high probability of its existence."

This Court has ruled that the reference to "high probability" in this instruction does not violate Sandstrom. State v. Coleman, supra.

Defendant's challenge to Instruction 27 is similar to his challenge to No. 26:

> "A person acts purposely with respect to his conduct or to a result which is an element of the offense when he has the conscious object to engage in that conduct or to cause that result."

Defendant contends this instruction takes the State's burden of proof, beyond a reasonable doubt, and reduces it to something less than proof by a preponderance of the evidence. This is done by a subtle verbal manipulation using the words "infer," "high probability," and "conscious object."

Defendant failed to object to this instruction and is precluded from raising an objection for the first time on appeal. His objection is meritless in any event. The same reasoning adopted by Coleman in approving the "knowingly" instruction applies to the "purposely" instruction. The instruction merely defines the element of purposefulness pursuant to Montana law. That definition, referring to a defendant's "conscious object," is also consistent with modern concepts of intent.

> ". . . it is now generally accepted that a person who acts (or omits to act) intends a result of his act (or omission) . . .: when he consciously desires that result, whatever the likelihood of that result happening from his conduct; . . ." Coleman, 605 P.2d at 1056.

## Alleged Errors In the Failure To Give Instructions

Defendant argues the court erred in failing to give defendant's offered instruction no. 12 relating to impeachment.

Defendant contends that the instructions given to the jury were inadequate and that a stronger instruction should have been given because several witnesses of the State were former felons, were relatives of the defendant, and had admitted lying on previous statements.

Refusal to give instructions on the same subject is not prejudicial error. State v. Sullivan (1979), ___ Mont. ____, 595 P.2d 372, 36 St.Rep. 936. There were several instructions concerning impeachment of witnesses and the credibility of witnesses. These instructions were sufficient to caution the jury as to the witnesses' testimony during the trial and as to the law.

These instructions, read as a whole as they must be, fully and fairly cover the subject of the jury's determination of a witness's credibility. See State v. Azure (1979), ____ Mont. ____, 591 P.2d 1125, 36 St.Rep. 514.

Defendant contends the court erred in refusing to give defendant's offered instruction no. 17. This instruction would have told the jury that defendant could not be held responsible for the crimes charged if someone else performed the offensive conduct. The plain language of section 45-2-302, MCA, indicates this is incorrect.

The rule was properly presented to the jury in another instruction. Defendant's contention is identical to one presented in State v. Owens (1979), ____ Mont. ____, 597 P.2d 72, 36 St.Rep. 1182. The same holding is applicable in the present case. Defendant's proposed instruction was properly refused.

The judgment is affirmed.

_____
                         Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

This cause was submitted prior to January 5, 1981.

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.