No. 85-464

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

BRADLEY ALLEN WALLACE,

Defendant and Appellant.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and for the County of Rosebud,
The Honorable Alfred B. Coate, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James G. Hunt argued, Helena, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Joe Roberts argued, Asst. Attorney General, Helena
John S. Forsythe, County Attorney, Forsyth, Montana
Charles Sprinkle, Deputy County Attorney, Forsyth

Submitted: May 13, 1986

Decided: October 22, 1986

Filed: OCT 22 1986

Ethel M. Harrison
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Bradley Wallace appeals a Rosebud County jury verdict convicting him of aggravated assault. The issues on this appeal are:

(1) Whether the trial court erred in failing to either direct a verdict for appellant or order a mistrial because of the State's suppression of four witness statements.

(2) Whether the trial court erred in admitting the testimony of a doctor whose name was endorsed as a witness the first day of trial.

(3) Whether the trial court erred in admitting evidence of appellant's possibly incriminating statement where the State violated the court's discovery order by failing to notify defense counsel of the statement.

(4) Whether the cumulative error rule mandates reversal.

We find that only harmless error occurred in this case and, therefore, we affirm.

The peculiar nature of this case requires that we set forth the facts in some detail. On November 22, 1985, David Scott, the eventual victim of the assault, was drinking in a Colstrip, Montana, bar/bowling alley. Scott conversed with a friend, David Cogdill, who introduced him to two ladies seated at the bar. Scott had not previously known the two ladies, Darla Baldwin and Shellie Miars. The appellant and his girlfriend, Theresa Wray, were sitting at the bar next to Cogdill, Miars and Baldwin. Scott was moving around the bar talking with different people. Cogdill, Miars, Baldwin and Scott all agree that the appellant referred to Scott, a

Native American, as a "prairie nigger" while Scott was only a few feet away. Scott and the appellant were not acquainted. Scott became upset and wanted to ask appellant why he was insulting him. Cogdill and the ladies calmed Scott down and he did not physically confront appellant at that time. Appellant claims that Scott then began cursing him and Cogdill did hear Scott describing appellant with an unpleasant phrase. At that point, appellant's girlfriend leaned over the bar towards Scott and made a statement variously described as "shut up" or "you guys think you're so tough" or "shut up or there will be some ___."

Scott testified that he did not remember what happened at this point. Most of the witnesses agree that Scott began to walk towards appellant. Arnie Garner, the bartender, was watching the appellant and he testified that the appellant emptied his beer mug on the floor, concealed the mug behind his leg, stood up, approached Scott and smashed the mug over Scott's head. All the witnesses agree that Scott had his hands down at his sides. Garner stated that he did not see anyone threatening the appellant or Theresa Wray and that there were no indications that Scott was getting ready to fight. Miars and Baldwin both testified that Scott did nothing to provoke the attack. Tom Mulcahy, an acquaintance of Scott who was also present in the bar, testified that Scott was not threatening anyone nor was he in a challenging stance. Cogdill testified that he thought Scott was approaching appellant possibly to "ask appellant to step outside."

Appellant admits smashing the beer mug over Scott's head but maintains that he did so in self-defense. Appellant

3

testified that Scott, without provocation, began verbally assaulting appellant; that Theresa Wray asked Scott to shut up; that Scott immediately approached appellant at a brisk pace; that Scott had his hands at his sides; that he thought Scott was going to physically assault appellant or Wray; and that he was afraid of a confrontation.

The initial blow shattered the beer mug and left appellant holding the mug's jagged glass handle. The bartender, Garner, testified that at the two places the handle joined the mug, the handle had jagged, razor-like edges protruding one-half to three-fourths of an inch. Appellant continued to assault Scott by slashing at his head with the glass handle until Garner grabbed appellant and held his arms back. Garner and Tom Mulcahy saw appellant slash Scott once while Cogdill stated that appellant slashed Scott two or three times. Both Miars and Baldwin also testified that appellant tried to cut Scott with the broken handle.

Dr. Riggenbach testified as to Scott's injuries. Scott suffered a one inch long laceration and a two and one-half inch long laceration, both on his forehead. The longer one penetrated to the skull. He also received a "rather severe" laceration of the ear. The doctor performed a skin graft on Scott's ear, a small part of which was missing. The doctor guessed that he used 30-35 stitches on Scott in all.

The police arrested appellant shortly after the attack and took him to the Colstrip jail. A deputy sheriff testified that at the jail the appellant remarked, "It's a hell of a deal . . . when you can't protect yourself from some . . . blanket ass that's going to kick your ass."

Shortly after the incident, Baldwin, Miars and Cogdill gave short, written statements to the police. Garner gave a taped statement to the police. About a week later, Cogdill, Baldwin and Miars gave more detailed, taped statements to an investigating officer. The deputy county attorney charged appellant with aggravated assault.

At the January 1985 omnibus hearing for this case, the county attorney agreed in writing that the State had "disclosed all evidence in its possession, favorable to the defendant on the issue of guilt." The District Court also granted defendant's motions for (1) discovery of all statements made by defendant to investigating officers or to third parties and in the State's possession; (2) discovery of the names of the State's witnesses and their statements; and (3) inspection of all physical or documentary evidence in the State's possession. Contrary to the court's ruling, prior to trial the State only provided appellant with the three witnesses' short written statements. The State failed to provide defense counsel with the four longer, taped statements or with appellant's racist statement made at the jail.

Immediately prior to trial on May 28-31, 1985, appellant made a motion in limine to prevent the State from referring to any statements or admissions made by him against his interest. The State then informed the court and defense counsel of appellant's remark at the jail referring to a "blanket ass." The court later allowed a deputy sheriff to testify, over appellant's objection, to this remark.

While cross-examining Cogdill at trial, defense counsel learned of the State's failure to produce the four taped

5

witness statements. At that time, two of those witnesses had already testified and defense counsel was in the middle of questioning Cogdill, whose taped statement had been suppressed. The statements were in some respects minimally supportive of appellant's theory of self-defense. Upon learning of the withheld statements, defense counsel moved for a directed verdict of acquittal. The court did not immediately rule on that motion.

Later in the trial, the State called Dr. Riggenbach, the victim's treating physician, as a witness. Appellant objected claiming surprise and pointed out that the doctor's name was not originally endorsed on the information. The State had endorsed the doctor's name as a witness on May 28, the first day of trial. The trial court allowed the doctor to testify, relying in part upon a prosecutorial brief filed on May 22 which indicated the doctor would testify.

At the close of the State's case, appellant moved for a directed verdict of acquittal or, alternatively, for a mistrial. The court denied both motions and the jury convicted appellant of aggravated assault. This appeal followed.

Nothing in the record suggests, nor does appellant imply, that the suppression of evidence in this case was other than negligent. Thus, we treat this case as involving the negligent suppression of evidence. We agree with appellant that the State acted improperly in suppressing the taped statements and the jail statement and in endorsing Dr. Riggenbach's name on the information on the first day of trial. However, we find that these errors are in all

6

respects harmless errors and, therefore, not grounds for reversal.

Montana follows the United States Supreme Court's definition of what constitutes harmless error in a particular case. State v. Daniels (Mont. 1984), 682 P.2d 173, 41 St.Rep. 880; State v. Warnick (Mont. 1985), 699 P.2d 1049, 42 St.Rep. 675. The United States Supreme Court has expressed the harmless error rule as:

> the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.

Delaware v. Van Arsdall (1986), 475 U.S. ____, ____, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684. We note that the negligent suppression of evidence could constitute constitutional error. ("The Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment." California v. Trombetta (1984), 467 U.S. 479, 480, 104 S.Ct. 2528, 2530, 81 L.Ed.2d 413, 417. Such suppression of evidence can be subject to the harmless error rule. See United States v. Agurs (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342.

Miars, in her suppressed statement, said that the victim, David Scott, "kept telling us he would like to go talk to [appellant], which we assumed would end up in a fight." Miars also stated that "I was watching [the victim] to make sure he didn't have anything in his hands." Miars said that after Theresa Wray's comment, "[Darla and I] both knew there would be a fight." These portions of Miars'

7

statement are mildly exculpatory for appellant. The rest of her statement is repetitive of other testimony at trial or of her written statement provided to appellant before trial.

The suppressed statement of Darla Baldwin was similar to, and perhaps less exculpatory for appellant than, her written statement provided to appellant before trial. Garner's taped statement was provided to appellant midway through trial and before Garner testified. Garner's statement basically establishes that he knew there was going to be a problem. The suppressed statements of Baldwin and Garner in no way prejudiced appellant.

The suppressed statement of David Cogdill was fairly supportive of appellant's theory of self-defense. Cogdill said that after the "prairie nigger" comment, "I knew there was going to be a fight;" that as David Scott walked towards appellant "I think [Scott] had intentions of drilling him . . . ;" and that Cogdill tried to clear the bar of beer bottles because "I knew there was going to be a fight." Defense counsel learned of these statements midway through his cross-examination of Cogdill. Counsel obtained a copy of the statement and used it effectively during the rest of the cross-examination. Counsel brought out for the jury's consideration the exculpatory comments for appellant contained in the statement. Thus, any prejudice caused by the suppression of Cogdill's statement was substantially mitigated and the jury was able to consider the exculpatory comments.

The last piece of suppressed evidence was appellant's statement made while he was confined in jail. That statement is mildly exculpatory in that appellant was maintaining he

8

had acted in self-defense. However, on May 24, 1985, four days before trial, the State filed a pre-trial brief with the court which recited the jail statement and warned that the statement would be used against appellant. Thus, the appellant did have belated notice of the remark.

Normally we would have serious misgivings about the validity of any conviction where there has been a violation of the court's discovery orders. However, in this case, we can confidently say there was only harmless error in light of all the testimony, especially the appellant's.

We find that, except for Cogdill's statement, the suppressed evidence was either repetitive of other testimony or only minimally supportive of a self-defense theory. The damage caused by the suppression of Cogdill's testimony was substantially mitigated as explained above. Moreover, we find that appellant's own testimony belies his theory of self-defense.

Every witness, including appellant, agreed that at the time of the assault David Scott had his arms at his sides. Except for appellant, every witness agreed that Scott did not provoke the appellant to a physical assault. Appellant's story is that Scott "verbally assaulted" him; that Scott approached appellant at a quick walk; that he thought Scott was approaching to physically attack appellant or Theresa Wray; and that appellant was afraid of a confrontation. In response to this "threat", the appellant lashed out with the beer mug. Two witnesses stated that appellant concealed the mug behind his leg from Scott. Cogdill, Garner, Mulcahy, Miars and Baldwin all agreed that appellant continued to cut or slash at Scott after the initial assault.

9

Under Montana law, specifically § 45-3-102, MCA:

> A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force.

We believe beyond a reasonable doubt that a jury would decide that appellant's general feeling of apprehension, unsupported by specific physical actions or threats by the victim, could not justify striking David Scott with a glass mug and slashing him with a sharp, glass handle. The continuing nature of the assault was especially unjustified. We hold that the error in this case was harmless beyond a reasonable doubt.

Appellant also complains that the trial court erred in allowing the State to endorse Dr. Riggenbach's name on the information on the first day of trial. On May 22, the State filed a reply brief which stated that the State had made travel arrangements for the treating physician. On May 24, the State filed a pre-trial brief which stated that Dr. Riggenbach would testify. On May 29, appellant claimed surprise as to the doctor's testimony.

The issue here is similar to an issue in State v. Liddell (Mont. 1984), 685 P.2d 918, 41 St.Rep. 1293. In Liddell, we upheld the District Court's decision allowing the endorsement of an additional witness on the day of trial. There, as here, the defense knew of the witness' connection with, and importance in, the case. In Liddell, we stated that, "[I]t is discretionary with the District Court to allow additional witnesses, . . . " 685 P.2d at 924. Therefore,

given that appellant cannot convincingly claim surprise, we find no error under this issue.

Finally, appellant argues that the cumulative error in this case mandates reversal of his conviction. The cumulative error doctrine refers to a number of errors prejudicing a defendant's right to a fair trial. State v. Close (Mont. 1981), 623 P.2d 940, 948, 38 St.Rep. 177, 187-188. In this case, we find no prejudicial error affecting the substantial rights of defendant.

Affirmed.

Justice

We concur:

Chief Justice

Justices

11

IN THE SUPREME COURT OF THE STATE OF MONTANA

---

No. 85-464

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

BRADLEY A. WALLACE,

Defendant and Appellant.

---

DISSENTING OPINION

---

As history shows, good law must occasionally rise out of the ashes of bad facts. Such should be the case in State v. Wallace. The facts indicate that the victim, a Native American named David Scott, was dealt with brutally and the Appellant deserves punishment. Unfortunately, we see some relatively serious procedural flaws in the State's presentation of its case. It is always difficult to measure the impact of procedural flaws, but the result of a reversal is to try the case again. This is a fair response to serious procedural flaws, and will maintain the public confidence in judicial integrity.

At the close of the State's case during the trial, the District Court responded to the defense motions regarding the failures of the State to disclose evidence with these words:

> All right. This is the first time in 18 years that the State of Montana has not provided full discovery and I will accept the State's excuse that it was a mistake and in view of the testimony given on both direct and cross-examination, it would appear to the Court that the defense counsel was capable of bringing out all information that he desired or at least he's been able to provide a good defense, and perhaps the State is entitled to make one mistake every 18 years so the motion is denied. (Trans. p. 322, LNS. 6-14).

-12-

part of the Defendant. On top of this error, the failure to timely endorse an expert witness could have conceivably caught the Defendant's counsel unprepared considering the technical details involved in the cross-examination of a doctor. Finally, the statements made by the Defendant to the Deputy Sheriff are clearly prejudicial, and any defense counsel would want to know such statements in advance in order to prepare his case to lessen their impact. Proper notice, as required by the Omnibus Order, might have changed the defense tactics. In sum, proper State procedure might have lead to better defense preparation, might have improved the cross-examination of an expert witness, might have given rise to softening the impact, and might have provided more credence to the defense of justifiable use of force. For example, the information might have been addressed in the opening statement, and it is the experience of many trial lawyers that addressing one's weaknesses in an opening statement can be effective strategy.

In summary, we are true believers in the procedures established through omnibus hearings and orders, and the philosophy of preventing surprise and having the opportunity to prepare your best case. This is the proper procedure to best promote justice. These procedures were violated, albeit unintentionally. It is the job of this Court -- not to require perfection -- but to require high standards such that defendants are not unfairly prejudiced. The fine line was crossed in this case, and another trial is in order.

To a certain extent we agree that it is understandable and predictable that the State will make a mistake every now and then. However, it should not be to the detriment of an unlucky defendant. Rather, the State should take the consequences, and re-try the matter.

The Appellant presented three strong arguments regarding the failure of the State to disclose pertinent evidence. First, the State failed to disclose certain witness statements which were favorable to the defense. Second, the State failed to endorse an expert witness in a timely fashion. And third, the State failed to notify the Defendant of his alleged statements previously made to an investigating officer. These errors -- and we definitely perceive these shortcomings as errors -- violated the Omnibus Order of the District Court. The real issue in this case is whether the omnibus procedures and orders are meaningful or meaningless. We believe they are meaningful, and a defendant should not be penalized by their violation. Once that omnibus procedure order is given, it is clear that parties and their counsel rely on its contents. It is only fair and just that those orders be upheld. According to precedent in this State, the "purpose of pre-trial orders is to prevent surprise and to permit counsel to prepare their case for trial on the basis of the pre-trial order." State v. Doll, 42 St. Rptr. at 44. It would stretch one's imagination to believe that the series of procedural violations on the part of the State did not to some extent prejudice and hamper the Defendant. The rule laid down by State v. Patterson, 40 St. Rptr. 600 (1983), is that the nature of negligently suppressed information must be material, vital, exculpatory, and prejudicial. It is definitely conceivable that this standard is met in the case at bar. Some of the statements which the State failed to disclose tend to show justifiable fear and justifiable use of force on the

-14-

We therefore dissent to the majority Opinion.

_____
Joseph B. Gary, District Judge
sitting for Justice William E.
Hunt

We concur:

_____
Justice John C. Sheehy

_____
Justice Frank B. Morrison