No. 86-492

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

JERRY PAUL FORSYTH,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Keller & German; Robert S. Keller argued, Kalispell,
Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Robert F.W. Smith argued, Asst. Atty. General, Helena
Ted O. Lympus argued, County Attorney, Kalispell,
Montana

---

Submitted:  May 5, 1988

Decided:  August 25, 1988

Filed:  AUG 2 5 1988

_Ethel M. Harrison_

Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

Forsyth appeals his conviction for deliberate homicide. This case first went to trial in Kalispell in 1980, and resulted in a conviction this Court reversed because the jury was not instructed on the elements of deliberate homicide. State v. Forsyth (1982), 197 Mont. 248, 642 P.2d 1035. A second trial at Polson in 1982 resulted in a hung jury. The third trial at Kalispell in 1985 resulted in the conviction Forsyth appeals. We affirm.

Forsyth presents the following issues for review:

(1) Whether the Court erred in failing to grant Forsyth's motion to dismiss for lack of speedy trial?

(2) Whether the Court erred in failing to grant Forsyth's motion to dismiss for denial of due process because:

    A. The State failed to properly disclose new evidence, favorable, or unfavorable, on the issue of appellant's guilt, contrary to the District Court's standing order.

    B. The State deliberately withheld exculpatory evidence.

    C. The State initiated prosecution of a critical witness without probable cause one week before trial for the sole purpose of discrediting the witness.

(3) Whether the Court erred in permitting the State to add a witness in the middle of trial, and then erred in failing to grant Forsyth's request for a mistrial as a consequence?

(4) Whether the Court erred in failing to order the place of trial outside of Flathead County, and in denying Forsyth's motion for new trial accordingly?

(5) Whether the Court erred in failing to grant Forsyth's motions for a new trial based upon newly discovered evidence?

(6) Whether the Court erred in failing to award attorney's fees?

(7) Whether the Court erred in increasing the defendant's sentence, and in failing to credit the defendant with time for incarceration?

The facts surrounding the murder of the victim, Karen Forsyth, are recorded in State v. Forsyth (1982), 197 Mont. 248, 642 P.2d 1035.

I

In connection with the first issue, Forsyth contends that the delay between his second trial and his third trial violated his speedy trial rights. Forsyth presented the following documents as relevant to the speedy trial issue:

January 2, 1983 - Defendant's oral request to the Court for a transcript of the second trial.

January 11, 1983 - Defendant's motion that his counsel continue to be appointed, and be paid at State expense.

January 17, 1983 - Defendant's written motion for a transcript of the second trial.

January 25, 1983 - Defendant's motion to dismiss for double jeopardy grounds based upon jury tampering and prosecutorial misconduct, as well as a motion to strike the testimony of Douglas Richards on the grounds that he was incompetent; and evidentiary hearings were requested as to jury tampering and prosecutorial misconduct.

3

February 9, 1983 - Hearing on Defendant's motions.

February 14, 1983 - Defendant's Affidavit of Indigency filed, at request of Court.

February 22, 1983 - Letter of Gary Crowe, Esq., to the Court explaining his conflict of interest in being appointed to represent the Defendant.

February 28, 1983 - Order denying all motions and requesting the Defendant to either make suitable and acceptable arrangements with his present counsel, or the Court would appoint counsel from the public defenders; Defendant's indigency status affirmed.

March 10, 1983 - Defendant's response to the Court's Order of February 28, 1983, coupled with a written request for the transcript of the second trial.

March 15, 1983 - Defendant's Petition to the Montana Supreme Court for a Writ of Supervisory Control.

May 11, 1983 - Supreme Court Order denying the Writ for the reason that all but one of the grounds asserted were premature, and, in addition, with respect to the appointment of counsel, that no showing had been made that the public defender firms were incompetent or unable to represent the Defendant.

May 17, 1983 - Order requiring Defendant to elect counsel in five days, and if counsel is selected, an additional five days within which time to notify the Court of the required portion or portions of the transcript and the reasons or intended use thereof.

May 19, 1983 - Defendant's letter to the Court requesting a hearing with respect to the conflicts of the public defenders, and requesting the transcript of the second trial.

May 27, 1983 - Order setting a hearing on appointment of counsel for June 22, 1983.

June 22, 1983 - Hearing on appointment of counsel, and Defendant renewed his motions in writing, to appoint the firm of Keller and German as counsel at public expense, for a transcript of the second trial, and to conduct evidentiary hearing on the jury tampering and the prosecutorial misconduct; and informed the court of a desire for a speedy trial.

July 28, 1983 - Attorneys conference by telephone in which the Court requested the Defendant to designate the portions of the transcript that did not need to be transcribed, and requested written comment by both parties with respect to the place of trial.

August 12, 1983 - Order denying Defendant's motion for appointment of counsel, and withholding ruling on the request for a transcript, until response by counsel.

August 19, 1983 - Response by Keller and German.

August 23, 1983 - Order appointing Messrs. Doran and Allison as counsel for Defendant.

August 29, 1983 - Defendant's Petition to Montana Supreme Court for Writ of Supervisory Control.

October 6, 1983 - Writ granted, and Keller and German appointed as counsel for Defendant at public expense.

October 18, 1983 - State's motion to Supreme Court for Reconsideration.

October 31, 1983 - Supreme Court Order, reaffirming Order of October 6, 1983.

November 14, 1983 - Part of transcript ordered to be transcribed, tentative trial date set and attorneys conference set for December 12, 1983.

December 12, 1983 - Attorneys conference: Defendant's motions renewed, in writing, for evidentiary hearings on jury tampering and prosecutorial misconduct, and for remainder of transcript.

December 23, 1983 - State's motion for Change of Venue.

January 5, 1984 - Hearing on State's Motion for Change of Venue.

January 13, 1984 - Order, remainder of transcript ordered and tentative trial date of January 30 vacated.

March 15, 1984 - Minute entry order setting evidentiary hearings.

April 5, 1984 - Evidentiary hearing on jury tampering.

April 6, 1984 - Evidentiary hearing on prosecutorial misconduct.

April 23, 1984 - Last volume of transcript of second trial delivered.

April 24, 1984 - Order denying Defendant's motions to dismiss for Double Jeopardy and lack of Due Process.

May 4, 1984 - Defendant's motion to dismiss for lack of speedy trial.

May 10, 1984 - Hearing on motion to dismiss for lack of speedy trial.

May 23, 1984 - Order denying Defendant's motion to dismiss for lack of speedy trial.

June 6, 1984 - Order granting State's Motion for Change of Place of trial, and setting trial date of October 1, 1984.

July 11, 1984 - Defendant's second motion to dismiss for lack of speedy trial.

July 13, 1984 - Hearing on motion to dismiss for lack of speedy trial, and Order denying Defendant's motion to dismiss for speedy trial.

July 23, 1984 - Request for transcript of hearing of January 5, 1984 (change of venue), April 5-6, 1984 (evidentiary hearing on jury tampering and prosecutorial misconduct), and July 13, 1984 (second speedy trial hearing).

We have reviewed these documents.

On page 48 of his opening brief, Forsyth concedes that the time between October 1, 1984, to July 2, 1985, is chargeable to the defense as time occupied in an unsuccessful attempt to obtain a writ of supervisory control. (An October 1, 1984, trial date was vacated prior to this Court's resolution of the writ petition.) However, we date the beginning of this period as July of 1984, instead of October of 1984, because a letter shows that preparation for this writ began in the lower court at least as early as July 18, 1984. The letter documents Forsyth's request to the Clerk of Flathead County to prepare a transcript of the lower court's hearing on jury tampering and prosecutorial misconduct for use on the writ petition. The relevant period is therefore from January of 1983, to July of 1984.

Forsyth contends that delay caused by the State mandates dismissal because his speedy trial rights were violated. The District Court considered and rejected Forsyth's motion for dismissal for lack of a speedy trial holding that a rigorous defense rather than the conduct on the part of the State caused the delay. We affirm on this issue.

First, we hold that the length of delay which may be attributed to the State is sufficient to trigger further analysis, and therefore balancing of the four factors set out in Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. See State v. Bailey (1982), 201 Mont. 473, 478, 655 P.2d 494, 497. The four factors are; (1) length of delay, (2) reason for delay, (3) defendant's assertion of the right, and (4) prejudice to the defendant. Bailey, 655 P.2d at 497. In analyzing a particular speedy trial claim using the four factors, it must be remembered that:

> "none of the four factors is recognized as either a necessary or sufficient condition to a finding that the right to a speedy trial has been deprived. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. The Court must still engage in a difficult and sensitive balancing process. See Barker, 407 U.S. at 533. 92 S.Ct. at 2193."

Bailey, 655 P.2d at 497 (quoting State v. Larson (Mont. 1981), 623 P.2d 954, 957, 38 St.Rep. 213, 215). A lesser delay will be tolerated for simple street crimes than for complex offenses. Bailey, 655 P.2d at 498.

The focus of the dispute in this complex homicide prosecution is the "flag all litigants seek to capture ... the reason for delay". State v. Loud Hawk (1986), 474 U.S. 302, 315, S.Ct. 648, 656, 88 L.Ed.2d 640, 654. Forsyth attacks the District Court's conclusion that a vigorous defense caused the delay in this case. In this regard, he contends that the pursuit of his constitutional right to counsel and transcript occasioned much of the delay in this case, and that the delay caused by pursuit of these rights may not be attributed to a defendant under this Court's decision in Bailey.

Forsyth contends specifically that the time from January of 1983, to April of 1984, must be attributed to the State because it was not until April of 1984 that the defense received a complete transcript. Forsyth also points out that it was not until October of 1983 that appropriate counsel was appointed.

Forsyth's further contention on attribution of delay concerns the State's change of venue motion. In this regard, he contends that the time from January 5, 1984, to June of 1984, must be attributed to the State because during that period the parties argued the venue issue.

8

The State responds that delay associated with bona fide pretrial motions where the State has not been independently dilatory should not be attributed to the State. The State also contends in the alternative that any delay in this case attributable to the State constitutes institutional delay which must be weighed less heavily than delay caused by intentional prosecutorial delay.

An analysis of the pretrial motions made in the lower court prior to the third trial supports the State's position. First, in connection with the appointment of counsel, the controversy in the lower court in 1983 hinged on whether the law firm handling Forsyth's defense through the first two trials, Keller and Gilmer, (later Keller and German), would continue to represent Forsyth. Forsyth, with help from his family, had paid the law firm himself for this representation. By the end of the third trial these funds were exhausted, and Forsyth requested that his old firm be appointed at public expense. The State objected contending that firms Flathead County already had on retainer for public defense should represent Forsyth. As explained below in this opinion, Forsyth later prevailed on the appointment of counsel issue.

In connection with the motion for a transcript after the second trial, the State objected contending that Forsyth could make do with the transcript from the first trial. The lower court declined to rule on Forsyth's transcript request reasoning that counsel should be appointed first. Once appointed, according to the lower court, defense counsel could make a request specifying which portions of the record should be made available and which should not.

The venue motion involved the parties' contentions on an appropriate forum for a fair trial. The State proposed returning venue to Flathead County, the venue of the first

trial, and trying the case with a jury selected from Toole County residents. Forsyth agreed that venue should be changed from Lake County, but opposed the State's proposal arguing that a trial in Flathead County would not be fair even if the jury were selected from Toole County.

A motion to dismiss alleging prosecutorial misconduct and double jeopardy because of jury tampering accompanied Forsyth's motions for appointment of counsel and for procurement of a transcript in January of 1983. Forsyth also moved for evidentiary hearings on jury tampering and prosecutorial misconduct. In February of 1983, the District Court denied the motions, and Forsyth petitioned to this Court for a writ of supervisory control. This Court's order resolving the petition read as follows:

> PER CURIAM:
> Relator Forsyth has filed a petition for a writ of supervisory control to review various post-trial motions of the District Court. The State has filed a written response thereto. All have been considered by the Court.
> IT IS NOW ORDERED AND ADJUDGED AS FOLLOWS:
> 1. The Court accepts jurisdiction of the petition for writ of supervisory control for the purpose of the rulings hereafter set forth.
> 2. Petitioner claims error by the District Court in refusing to appoint the law firm of Keller and Gilmer to represent the defendant in further proceedings at public expense. No showing has been made that the public defender firms of the county are incompetent or unable to represent defendant. Accordingly, there is no error in the District Court's refusal to appoint Keller and Gilmer for this purpose.
> 3. Petitioner claims error in the District Court's failure to order preparation of a transcript of the second trial at public expense. The record discloses that the District Court held this motion under advisement pending resolution of the selection of defense counsel. This claim of error is dismissed as premature.

10

4. Petitioner claims error in refusing an evidentiary hearing on the alleged misconduct of the prosecutor and the bailiff at his second trial. This claim of error is denied without prejudice and without a decision on the merits. It should be presented by defense counsel, when one is selected, in pretrial proceedings before the next trial, during the trial or upon appeal in the event of conviction.

5. Petitioner claims error by the District Court in failing to strike the testimony of Douglas Richards because the same is alleged to be incredible. The credibility of the witness and the weight to be given his testimony are patently questions for the jury.

6. Petitioner's claim that the case should be remanded to Judge Douglas Harkin for an evidentiary hearing is denied on the basis that by our foregoing rulings, no evidentiary hearing is necessary.

7. The Clerk is directed to mail a true copy hereof to counsel of record for the respective parties and to the Honorable Michael H. Keedy and the Honorable Douglas Harkin.

Following the disposition of Forsyth's first supervisory control petition, the case returned to the lower court where Forsyth attempted to show why the public defender firms in Flathead County could not represent him. On June 22, 1983, the lower court heard the counsel issue, and at that time Forsyth also renewed his motions for evidentiary hearings on his charges of prosecutorial misconduct and jury tampering.

On August 12, 1983, the District Court denied Forsyth's motion for appointment of his old law firm and appointed a public defender, and Forsyth immediately petitioned for a writ of supervisory control. During this period of time Forsyth's claims for prosecutorial misconduct and jury tampering were pending.

This Court granted Forsyth's second petition for supervisory control ordering as follows:

## ORDER

Relator Forsyth has filed a petition for a writ of supervisory control to review the orders of the District Court denying appointment of attorneys Keller and German at public expense to represent him in further proceedings and appointing attorneys Gary Doran and Robert Allison to represent him. The State has filed a written response to relator's petition. Both the petition and response have been fully reviewed by this Court. The extraordinary nature of this case requires that this Court explain the basis for its Order in detail.

On May 11, 1983, this Court denied Forsyth's previous petition for writ of supervisory control, stating that no showing had been made that the public defender firms of Flathead County are incompetent or unable to represent him. A hearing was then held by the District Court on June 22, 1983 to hear reasons why public defenders in Flathead County were unable to represent Forsyth. Present were Forsyth, his counsel, counsel for the State and representatives of all public defender firms in the county.

It was established at the hearing that the firm of Sherlock and Nardi was unable to represent Forsyth because of a conflict of interest. That conflict is uncontested by the State.

It was further established that public defender Gary Crowe, of the firm of Moore, Doran and Crowe, had a conflict of interest which prevented him from representing Forsyth. The details of this conflict were recorded at the hearing and Crowe also wrote a letter to the District Court stating that he had conflicts which prevented him from representing Forsyth. Because this conflict prevents Crowe from representing Forsyth, it also prevents any member of Crowe's firm from representing Forsyth. Code of Professional Responsibility DR 5-105(D) (1979). The District Court nonetheless appointed Gary Doran, a member of Crowe's firm, to represent Forsyth.

The only remaining public defender in Flathead County, Robert Allison, was also appointed by the District Court to represent Forsyth. Significantly, Allison is a sole practitioner with no felony trial experience. An in camera hearing

12

was conducted during the June 22, 1983 hearing to present information regarding conflicts of interest which prevent Allison from representing Forsyth. The transcript of that hearing was ordered sealed by the District Court because it contains discussion of confidential defense strategy. The District Court ordered that the transcript was to be opened only by order of this Court. We have examined the contents of that transcript and conclude that Allison has conflicts of interest which prevent him from representing Forsyth.

We hold that Doran and Allison are precluded by conflicts of interest from representing Forsyth and that Allison has no felony trial experience. The District Court's finding that there are no such conflicts is not supported by the record. For these reasons, we find the District Court abused its discretion in appointing Doran and Allison to represent Forsyth.

The District Court also states in its order of August 12, 1983 that to appoint Keller and German to represent Forsyth would undermine the quality and availability of public defense services in Flathead County and would drain the resources of the public defender program. There is nothing in the record to support these statements.

The record shows that Keller and German have offered to provide Forsyth the services of two attorneys for the hourly rate of one public defender. It has not been clearly established what fee arrangement exists between Flathead County and its public defenders for compensation in cases requiring expenditure of extraordinary amounts of time. The record shows that Keller and German spent approximately 1,650 hours in preparation for the first two trials. It is clear that preparation for trial by any other appointed attorneys would require much more time than for Keller and German. The record contains nothing to contradict the claim of Forsyth that the representation offered by Keller and German would be less costly to the county than appointment of new attorneys.

This unique case presents a question of lack of basic fairness in effectively depriving an accused of his counsel at such a late stage. Forsyth privately retained Keller and German to represent him in the two previous trials of this case at his own and his family's expense. Their funds are now depleted. The State, however, will

13

continue to be represented by the same prosecutors who have represented the State in the first two trials. To force upon Forsyth new attorneys at this stage would be unfair.

THEREFORE, IT IS ORDERED:

1. That this Court accepts jurisdiction of the petition for writ of supervisory control.

2. That the order of the District Court appointing public defenders Gary Doran and Robert Allison to represent relator Forsyth is vacated.

3. That the District Court appoint Keller and German to represent relator Forsyth at public expense, a reasonable rate of compensation to be established by the District Court.

4. The Clerk is directed to mail a true copy of this Order to counsel of record for the respective parties and to the District Court.

Following this Court's order appointing Keller and German, the District Court resumed jurisdiction of the case and the parties began the process of settling the remaining substantial pretrial controversies; how much of the testimony from the second trial would be transcribed, whether Forsyth would prevail on his motions to dismiss for jury tampering, and for prosecutorial misconduct, and where venue should lie for trying the case.

The pretrial issues set out above were resolved as follows: the District Court ordered that the State provide a full transcript of the second trial on January 13, 1984; the District Court conducted hearings on Forsyth's motion to dismiss for jury tampering and prosecutorial misconduct on April 5-6, 1984, and denied the motion April 24, 1984; the District Court granted the State's venue motion on June 6, 1984.

Between May of 1984 and July of 1984, the District Court considered two motions to dismiss for lack of speedy trial. Hearings preceded both motions, and the lower court settled the matter by denying the second motion on July 13, 1984. Following the denial of the speedy trial motion, as noted

14

above, Forsyth requested transcripts for the hearings on prosecutorial misconduct, jury tampering, change of venue, and speedy trial to submit with another petition for writ of supervisory control.

The lengthy recitation of these filings helps in analyzing the cause of the delay factor from Barker. First, the filings demonstrate that the time between the second trial and Forsyth's assertion of the speedy trial right in May of 1984, was taken up principally with issues first settled by the lower court, and then reviewed by this Court on petition for writ of supervisory control. For example, Forsyth moved for counsel, transcript, and evidentiary hearings on jury tampering and prosecutorial misconduct in January of 1983, and the lower court denied the motions in February of 1983. The petition for writ of supervisory control was filed in this Court in March of 1983, and the resolution from this Court on the petition came in May of 1983. Similarly, the second petition for supervisory control, on the issue of appointment of counsel, was filed with this Court in August of 1983, and granted in late October of 1983. Thus, the weight and attribution of the delay between January of 1983, and November of 1983, depends on the attribution and weight attached to the delay caused by the pretrial motions which resulted in these interlocutory appeals.

First, the State bears the burden of bringing an accused to trial, and good faith pretrial motions are not chargeable to the defendant. State v. Harvey (1979), 184 Mont. 423, 434, 603 P.2d 661, 667. Thus, we attribute the delay time from January of 1983, to November of 1983, to the State. However, different weight attaches to delay depending on the cause for delay. Harvey, 603 P.2d at 667. In this case, the block of time necessary to adjudicate pretrial motions

15

resulting in interlocutory appeals fails to weigh heavily in favor of Forsyth's claim.

The United States Supreme Court has stated that interlocutory appeals pit the "competing concerns of orderly appellate review on the one hand, and a speedy trial on the other". Loud Hawk, 474 U.S. at 314. In regard to the cause for delay factor, a majority of the Court agreed that delays due to a defendant's pretrial appeals:

> ordinarily will not weigh in favor of a defendant's speedy trial claims. . . . A defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial. As one Court of Appeals has noted in the context of a District Court's consideration of pretrial motions: "Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon." United States v. Auerbach, 423 F.2d 921, 924 (CA5 1969), rehearing denied, 423 F.2d 676, cert. denied, 399 U.S. 905 (1970).

Loud Hawk, 474 U.S. at 316-17. Here, the circumstances surrounding the delay caused by pretrial motions and appeals justifies the delay attributable to the State from January of 1983, to November of 1983. In particular, Forsyth's claims for jury tampering and prosecutorial misconduct necessitated proceedings and deliberations in the lower court and this Court. These claims, as explained later in this opinion, lacked merit. Forsyth's claim for exclusion of Richards's testimony, as documented in our first writ order, also lacked merit. Forsyth chose to avail himself of this writ procedure, and cannot now complain of the delay associated with deliberateness inherent in the process.

16

Forsyth also contends that the time attributable to adjudication of the appointment of counsel and transcript issues should weigh heavily in his favor because the State's position denied him constitutional rights. First, there is no showing that the State engaged in intentional delay designed to hamper the defense on these issues. And as stated by the United States Supreme Court, even "a defendant with a meritorious appeal would bear the heavy burden of showing an unreasonable delay caused by the prosecution in that appeal, or a wholly unjustifiable delay by the appellate court." Loud Hawk, 474 U.S. at 316.

Second, in this case the delay occasioned by adjudication of these issues was reasonable and justified. For example, the District Court reasoned that the appointment of counsel issue should be resolved before ordering a transcript because the portions of the record to be transcribed could vary depending on who was appointed. This Court refused to reverse the lower court's order holding that inasmuch as the motion was still pending, the claimed lack of transcript was premature. We hold here that any delay caused by the lower court's failure to order an immediate transcription was justified and reasonable given the pending counsel motion, and Forsyth's own motion to dismiss.

On the appointment of counsel issue and the delay it caused, in our first order we refused to grant the writ reasoning that no showing had been made that a conflict existed as to the available public defender firms in Flathead County. Thus, our ruling required further proceedings. The dissent in that order reasoned that fundamental fairness required appointment of the counsel serving Forsyth through the first two trials. Later this Court reversed holding that a conflict existed, and that it would be unfair to force Forsyth to proceed with different counsel. However, even

17

though the State's position on this issue was erroneous, it was not so unsupportable that it infers intentional delay.

Finally, we note that the delay during this period cannot be completely attributed to litigation of this single pretrial issue. Thus, the record supports the contention that delay attributable to the State is justified by: the need for evidence on the counsel issue, the complexity of the counsel issue, and the lack of a showing the prosecution acted intentionally to delay.

However, Forsyth contends this Court's decision in Bailey mandates dismissal. In Bailey, the State argued that the defendant's exercise of the right to a properly filed information constituted failure to assert the right to a speedy trial. Bailey, 655 P.2d at 498. Specifically, the State contended that the defendant failed to assert the right because he moved to dismiss the flawed information instead of allowing the case to go forward. This Court rejected the argument because:

> [w]e cannot penalize the defendant for exercising his statutory rights or for the prosecutor's mistake. To do so would be to deprive him of due process of law which is guaranteed under Article II, Section 7 of the Montana Constitution. Neither can we force him to choose one right over another, this was made clear by the United States Supreme Court in Simmons v. United States (1968), 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, where it addressed a similar issue and stated: "... we find it intolerable that one constitutional right should have to be surrendered to assert another."

Bailey, 655 P.2d at 498.

The particular issue addressed in Bailey, as well as the facts in Bailey, distinguish it from this case. First, in regard to the issue, in Bailey we addressed the intolerable choice offered to a defendant between trading the assertion

18

of the right factor for a properly filed information. In the present case, the issue concerns the cause for delay factor, not the assertion of the right factor.

The distinction is important. The presence of the assertion of the right is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right, and failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial. On the other hand, the reason for the delay factor, the principle point of contention here, involves a weighting process where "different weights should be assigned to different reasons". Barker, 407 U.S. at 531-32. Thus, as shown by Loud Hawk, the delay due to the State's positions on the transcript and appointment of counsel issues only affects the weighting process in the reason for the delay factor, not the more threshold issue of whether the defendant asserted the right to speedy trial. And, ordinarily, this delay will not weigh in favor of a defendant's speedy trial claim. Loud Hawk, 474 U.S. at 316.

Factually, the cases are distinguishable in regard to the cause of delay factor. In Bailey, the prosecutor clearly caused the delay by improperly filing the information. In this case, the defendant's motion to dismiss, coupled with his demands for evidentiary hearings, contributed substantially to the delay. Even if Forsyth's counsel and transcript motions had been granted immediately, there was still the time consuming issues of prosecutorial misconduct and jury tampering to resolve. Thus, we refuse to apply Bailey.

Forsyth also argues that the delay from January 5, 1984 to June 6, 1984, was occupied with the State's venue motion. Thus, according to Forsyth, this time period must be attributed to the State and weighed in favor of his speedy

19

trial claim. Forsyth's argument here sidesteps the fact that the venue motion was only one of the issues before the lower court during this period. At this stage in the case, Forsyth continued to actively litigate his motion to dismiss by renewing his request for evidentiary hearings on the jury tampering and prosecutorial misconduct issues. Thus, no deliberate delay is evident in regard to this time period. Rather, the case was stalled by Forsyth's motion to dismiss as well as by the lack of a decision on venue, and we refuse to weigh this time period heavily in favor of the claim because of the venue motion.

In sum, the State has carried the burden of justifying the delay occasioned by resolution of the numerous pretrial issues in this case. Thus, we hold that the cause for delay factor supports the State's position on this issue.

Similarly, the prejudice factor weighs against Forsyth's claim. Forsyth contends that the passage of time impaired his defense because: witnesses could not remember previous testimony, the use of the transcript to refresh witness memory was both cumbersome and ineffective, the State's new witnesses could have been discredited by the testimony of witnesses who are now unavailable, and the State presented demonstrative evidence more effectively.

In regard to the contentions on use of the transcript, we have reviewed the testimony of the following witnesses:

Dr. John Pfaff
Charles L. White
Debbie Stahlberg (Neff)
Dale Gifford
Doris Richards
Lupe Griffaldo
Sheryl Hester
Roger Krauss
Paul Hahn
Douglas M. Richards

Lynn Norbe
Greg Phillips
Dawnita French
Rand Cullen
Rolene Anderson
Dawn Morris
Ron Young
Kevin Appel
Dick Stotts
Steven Klingler

| | |
|---|---|
| Jan Beck | Jon William Ball |
| Paula Stalnaker | Bonnie Olson |
| Ron DuPuy | Dan Hess |
| Addison Clark | Jim Oleson |
| Jerry Forsyth | Ed Helmetag |
| Ray Dyer | Gary Red Elk |
| Tim Schuldheiss | Douglas Richards |
| William Harris | Rick Perry |
| Dana Joseph Kraut | Paul Forsyth |
| Dr. M.E.K. Johnson | |

On the basis of this review, we hold that the transcript mitigated the prejudice caused by failure of witness memory, and thus the prejudice factor in this regard fails to weigh heavily for Forsyth. In regard to the assertion that use of the transcript proved cumbersome and ineffective, we have discovered in our review of the testimony that the transcript also provided the defense with repeated opportunities to impeach State witnesses.

The State's demonstrative evidence which, according to Forsyth, improved with age to his prejudice, involved a test at trial demonstrating an allegation made by witness Douglas Richards. Richards told the jury that Forsyth had inserted a pencil in the barrel of a pistol left purposely at the scene of the murder in order to lift and place the pistol in the hand of the victim. Richards demonstrated how this was allegedly done at the first trial, and counsel for Forsyth pointed out that paint residues remained in the barrel after Richards's demonstration, but no residues were found in the barrel of the gun left at the scene. At the second and third trials, according to Forsyth, Richards had figured out how to lift the pistol without leaving residues. Thus, Forsyth claims prejudice.

This particular contention does little to further Forsyth's claim. At the third trial Forsyth called a witness who had served as an alternate juror. This witness testified

21

to the presence of paint chips in the barrel at the first trial. Thus, evidence discrediting Richards's demonstration was not lost to the defense.

Forsyth also argues that the passage of time impaired his ability to counter the testimony of Charlie Perkins. Perkins testified at the third trial to an alleged jailhouse confession made by Forsyth following the first trial. Forsyth claims that unavailable witnesses could have discredited Perkins.

This claim is necessarily speculative and carries less weight than it would if the record supported it. At any rate, we have considered it, and we have also considered the fact that Forsyth called numerous witnesses to discredit Perkins's testimony. Thus, prejudice fails to weigh heavily in favor of Forsyth's claim here.

The prejudice factor should be evaluated in light of the defendant's interests the right to speedy trial protects; prevention of oppressive pretrial incarceration, minimization of anxiety and concern of the accused, and most importantly, limiting the possibility that the defense will be impaired. Barker, 407 U.S. at 532. None of these interests compel a finding that the State violated the speedy trial right in this case. The State freed Forsyth between trials, and the transcript minimized impairment of the defense.

In regard to the assertion of the right factor, we accord it some weight in favor of Forsyth in analyzing his speedy trial claim. However, another relevant factor here is that Forsyth's assertion of his speedy trial right was preceded by his time consuming motion to dismiss. Bailey states that the defendant does not trade the assertion factor for a properly filed information. However, we hold in this case that Forsyth's jury tampering and prosecutorial misconduct claims constitute circumstances affecting the

22

assertion of the right factor. These circumstances reduce the weight in favor of Forsyth in regard to the assertion of the right factor, and inasmuch as we have held that the weight of the other factors falls for the State, we refuse to dismiss because the right was asserted.

In summary, we affirm on this issue because the case presented complex issues, and the delay attributable to the State must be weighed less heavily as institutional delay. We are also persuaded to affirm because the prejudice Forsyth suffered as a result of the delay was mitigated by the presence of transcripts from the previous trials, and by Forsyth's release on bail between the second and third trials. Thus, Forsyth's speedy trial claim has failed to convince this Court, and we affirm on this issue.

II

In connection with subissue A of the second issue, the relevant facts and procedure are as follows: Douglas Richards revealed to the prosecution prior to the third trial that he had related to Rand Cullen details of the murder in 1979. Cullen testified at the third trial concerning Richards's statements.

Dr. M.E.K. Johnson testified at the first and second trials that the blow to the head Forsyth received on the night of the murder was of sufficient force to knock Forsyth unconscious. At the third trial Johnson varied his testimony by stating that he had become more skeptical that the blow rendered Forsyth unconscious.

The prosecution listed the victim's mother, Shirley Kienas, as a witness for all three trials, but only called her for the third trial. She testified at the third trial concerning her daughter's marital relationship with Forsyth.

23

The State knew that Cullen possessed important knowledge of the murder after taking his statement in January of 1984, but did not reveal Cullen's identity to the defense until August of 1985. The State became aware that Dr. Johnson had changed his testimony sometime after the second trial. In August of 1985 the State notified the defense that the State planned to call Johnson as a witness. The State probably knew the substance of Shirley Kienas's testimony prior to the first trial.

Kevin Appel and Paul Hahn were new witnesses at the third trial. They testified in regard to events they witnessed as Kalispell police officers at the time of the murder. The parties agree that the substance of their testimony was not new. The District Court's standing order required the prosecution to notify the defendant of any new material regarding the guilt or innocence of the defendant.

Subissue A:

Forsyth claims that the State violated his due process rights by failing to comply with the lower court's standing discovery order mandating disclosure of new evidence. Forsyth also argues that the lower court improperly allowed amendment of the information to include new witnesses under the authority provided by § 46-15-301(1), MCA (1983). We hold that the lower court properly applied § 46-15-301(1), MCA (1983), that any violation of the discovery order constitutes harmless error, and that Forsyth has no due process claim under this subissue.

First, Forsyth argues that the lower court erred by allowing Rand Cullen to testify over his objections. Forsyth concedes that the State revealed Cullen's potential as a witness on August 1, 1985, but contends the State should have revealed him sooner, and that prejudice resulted from the State's late revelation.

24

Forsyth claims prejudice from the State's failure to reveal Cullen as a witness arguing that Debbie Bremner, a witness close to Richards at the time that Richards allegedly revealed the murder to Cullen, could have discredited Cullen's testimony. Bremner was a witness at the first two trials, but was unavailable for the third trial.

Section 46-15-301(1), MCA (1983) (repealed in 1985) (in effect at time of trial), reads:

> (1) For the purpose of notice only and to prevent surprise, the prosecution shall furnish to the defendant and file with the clerk of the court at the time of arraignment a list of the witnesses the prosecution intends to call. The prosecution may, any time after arraignment, add to the list the names of any additional witnesses upon a showing of good cause. The list shall include the names and addresses of the witnesses. This subsection does not apply to rebuttal witnesses.

Section 46-15-301(1), MCA (1983).

Forsyth concedes Cullen was revealed before trial, but contends that the lower court violated the statute's spirit and intent by allowing the testimony. See State v. Klein (1976), 169 Mont. 350, 354, 547 P.2d 75, 77. Forsyth also contends that good cause is a threshold requirement for additions to the witness list under this Court's interpretation of § 46-15-301(1), MCA (1983), in State v. Haag (1978), 176 Mont. 395, 578 P.2d 740, and thus, absent a showing of good cause, no addition is allowed.

The State contends that good cause existed because the State lacked knowledge that the case would go to trial until July of 1985, and that at any rate, Forsyth has failed to show prejudice which could not be cured by a continuance. See Klein, 547 P.2d at 77.

25

Section 46-15-301(1), MCA (1983), makes it clear that the proper remedy where surprise is claimed by additions to the witness list is to grant a continuance to meet the new evidence. Klein, 547 P.2d at 77; State v. Mckenzie (1980), 186 Mont. 481, 502, 608 P.2d 428, 441. Forsyth's contention that Haag requires a showing of good cause as a threshold to any amendment fails here because in Haag the issue was the prosecution's negligent failure to endorse any witnesses at the defendant's arraignment, and its continued failure to list witnesses until the date of the trial. Haag, 578 P.2d at 743-44. Thus, the good cause threshold inquiry in Haag concerned failure to present a witness list of known witnesses at the time of the arraignment. In this case, there is no contention that Cullen's name should have been endorsed on the information because there is no evidence that the State knew of Cullen at the time of the arraignment. Lack of knowledge constitutes good cause under the statute. State v. Smith (1986), 715 P.2d 1301, 1307, 43 St.Rep. 449, 455. Moreover, Haag is limited by its particular facts. Haag, 578 P.2d at 745.

Following discovery of Cullen, there is no evidence that the State intentionally withheld his identity to prejudice the defense. Rather, the record supports the State's contention that it negligently failed to inform Forsyth of Cullen's existence sooner because retrial depended on pretrial motions pending before the lower court and this Court. Lack of knowledge of the witness at the time of arraignment, together with uncertainty of whether the case would be tried and disclosure of the witness when the lower court set a trial date, are circumstances which sufficiently excuse the State's failure to disclose Cullen under the statute. Thus, we hold that allowing amendment is discretionary, and absent prejudice the lower court properly

26

allowed the testimony. See State v. Liddell (Mont. 1984), 685 P.2d 918, 924, 41 St.Rep. 1293, 1299. Similarly, in regard to violation of the discovery order, prejudice must be shown. See State v. Wallace (Mont. 1986), 727 P.2d 520, 524, 43 St.Rep. 1908, 1912 (suppression of evidence in violation of discovery order harmless error in the absence of a showing of prejudice).

Over nine weeks elapsed between disclosure of Cullen and the October 15, 1985, trial date. Thus, surprise cannot be claimed. However, Forsyth contends that the prejudice to his case could not be cured by a continuance because of the time passing between discovery of Cullen as a witness and the date of trial. Specifically, Forsyth's brief reads:

> Bremner testified at the first two trials, but she cannot be found for the third trial. Thus, there is no chance to interrogate her with respect to Rand Cullen or Doug Richards. She specifically was with Richards when he had his third, and last, meeting with Cullen [Tr. page 3261: 11-17] (emphasis added).

Page 3261 of the transcript records some of Richards's testimony, and reads in relevant part as follows:

Q. Do you recall going down to Missoula to get this pistol out of a pawn shop down there?

A. I do.

Q. One that you used for your stunt things and that sort of thing?

A. I do.

Q. And you would have had Debbie Bremner with you when you went to get it, would you not?

A. I believe so.

27

Q. And you saw Rand Cullen?

A. Correct.

A reading of this excerpt supports the possibility that Bremner could discredit Cullen's testimony because the implication is that since she was along on the trip, she was present when Cullen and Richards's discussed the murder. However, page 3262 of the transcript reads in relevant part:

Q. But when you got to Seeley Lake to visit with Rand, you dropped Debbie Bremner off at a cafe while you were talking to Rand by yourself?

A. Correct.

Q. She knew what your story was at that time, didn't she?

A. No.

Q. You had already given it?

A. Wait, that was after the-- yeah, okay.

This last excerpt explains that Bremner was not present during the conversation between Cullen and Richards. Richards also discussed Bremner's involvement as follows:

Q. Why wasn't Debbie included in the discussion that you had with Rand about what happened in the bowling alley?

A. Because Rand was upset with me when I told him on Christmas and like I said it scared him. I did not want her to be with me if Rand belittled me. I didn't want to be humbled in front of her. It could have been a very embarrassing situation and I was trying to say I was sorry to him and I guess I didn't want to apologize and have him not accept it and do it in front of her.

28

Thus, Bremner's unavailability does not show prejudice which could not be cured by a continuance in regard to Cullen's testimony because there is no evidence Bremner witnessed any of the conversations constituting the source of Cullen's testimony.

Forsyth's other argument in regard to Bremner's supposed ability to discredit Cullen's testimony concerns Cullen's assertion that Richards appeared more upset during the period of time when he related details of the murder to Cullen. Forsyth contends Bremner could have testified on Richard's mental state. This assertion is wholly speculative, and it goes to a collateral matter in Cullen's testimony. Thus, Forsyth has failed to show prejudice by this contention.

Forsyth also claims that Cullen's memory lapses constitute prejudice which could not be cured by a continuance. However, the record reveals that Cullen's memory lapses existed in 1984, when the prosecution first took his statement. Thus, the memory loss occurred prior to the time the prosecution spoke with Cullen, and no prejudice may be ascribed due to Cullen's poor memory as a result of the State's failure to reveal Cullen until 1985.

Furthermore, our reading of the record reveals that the State correctly contends that Forsyth's failure to discredit Cullen's testimony did not result from any late revelation of Cullen's identity. Cullen was steadfast in his belief that Richards helped Forsyth plan and commit the murder. Inconsistencies between the details that Richards revealed to police and details he revealed to Cullen were brought out on cross-examination, and thus were available for consideration by the jury.

In summary, we have reviewed Cullen's testimony, and we conclude that the District Court acted within its discretion in allowing Cullen to testify. Good cause existed for not

29

listing Cullen on the information at the time of arraignment, so Haag does not apply. After discovering Cullen, the prosecution failed to immediately inform Forsyth of Cullen's potential as a witness, and arguably violated the discovery order. However, no surprise can be claimed, and we find no prejudice incapable of cure by continuance.

Proceeding under the contentions in subissue A, Forsyth argues that the admission of Shirley Kienas's testimony in regard to an incident where Forsyth allegedly urinated on the murder victim constitutes violation of the discovery order and denial of due process. Forsyth acknowledges that the prosecution listed Kienas as a possible witness at all three trials, but contends that the prosecution deliberately withheld the specific information concerning the incident when the defense requested specifics on Kienas's testimony.

The first reference to the incident occurred during the first trial when the State queried Forsyth concerning the term "yellow shower", and Forsyth denied knowledge of the term. On appeal of the first conviction the term surfaced when, during oral argument, one of the Justices on this Court asked for an explanation. Counsel for the parties did not know at that time what the term referred to.

Prior to the third trial, counsel for Forsyth inquired of the State what Kienas would testify to. The State informed Forsyth that Kienas would testify to Forsyth's stormy marital relationship with his wife. Forsyth failed to depose Kienas prior to trial. The fact that the State had attempted to uncover the alleged incident long prior to the third trial, and the fact that counsel for Forsyth knew Kienas would testify to Forsyth's marital relationship but failed to depose her, mitigates any failure to reveal occasioned here by the State's conduct. Furthermore, the testimony itself was cumulative to other evidence showing

30

Forsyth mistreated the victim. Thus, we refuse to predicate error on this contention in subissue A. _Wallace_, 727 P.2d at 524.

A further contention under subissue A is that the admission of the altered testimony of Dr. M.E.K. Johnson, violated the discovery order and denied Forsyth due process rights. Johnson's previous testimony had supported Forsyth's claim that robbers had rendered him unconscious with a blow to the head prior to his wife's murder by testifying that the blow could have knocked Forsyth out. Johnson testified at the third trial that he had become more skeptical that the blow Forsyth received the night of the murder would have sufficient force to render an individual unconscious.

Forsyth concedes in his brief that the District Court delayed Johnson's testimony so that he could be deposed by the defense. The defense also concedes that the lower court ruled that the prosecution could not call Johnson in its case in chief, and gave the defense an opportunity to obtain its own medical witness. Thus, Forsyth can claim neither surprise nor an inability to cure prejudice by continuance, and we affirm in regard to allowing Johnson's testimony.

Forsyth also complains that the testimony of Paul Hahn and Kevin Appel should not have been allowed, and that it prejudiced the defense. The specific prejudice assertion is as follows:

> Nothing they claimed to know in 1985 was "new," but it just added to the defendant's burden of discrediting ....

As shown by the quote from Forsyth's brief, Forsyth concedes no surprise existed in regard to this testimony. "[G]iven that the appellant cannot convincingly claim surprise, we find no error on this issue." _Wallace_, 727 P.2d at 525.

31

As to a violation of due process under subissue A, Forsyth cites no specific authority. However, this issue is easily resolved because prejudice is also required for a due process claim. State v. Craig (1976), 169 Mont. 150, 153, 545 P.2d 649, 651. Thus, no due process claim exists as to admission of testimony covered above.

Subissue B:

The relevant facts in regard to subissue B concern Rand Cullen's testimony. The assertion on appeal is that aspects of his testimony were exculpatory because the statements he remembered Richards making around the time of the murder varied with the story Richards gave to police. Forsyth contends that the prosecution's failure to reveal Cullen as a witness sooner than August of 1985 constitutes a violation of the State's duty to reveal exculpatory evidence. Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. We affirm on this subissue.

Forsyth contends his inability to better capitalize on inconsistencies between Richards's testimony, and the testimony offered by Cullen as to what Richards related to Cullen shortly after the murder, was due to the State's failure to disclose Cullen. Forsyth's brief cites to portions of the trial transcript where the defense revealed the inconsistencies.

First, in regard to this claim, the issue here is not whether the suppression of exculpatory material until after trial requires reversal for retrial, but rather whether the disclosure came so late as to prevent the defendant from receiving a fair trial. United States v. Xheka (7th Cir. 1983), 704 F.2d 974, 981. As stated in subissue B, we have found no prejudice in regard to failure to reveal Cullen. Thus, there has been no denial of fair trial, and we will not

32

proceed to consider the numerous other requirements for such claims as is made here.

Subissue C:

In regard to subissue C, the relevant facts are as follows: Gary Red Elk was a Kalispell police officer and friend of Jerry Forsyth at the time of the murder. Red Elk was called as a witness at the first trial by both the State and Forsyth. Red Elk worked to prepare Forsyth's defense prior to the first trial, and was helping with the defense prior to the second trial.

Prior to the second trial, the State charged Red Elk with accountability for the murder of Karen Forsyth. The State supported the charge with statements made by Douglas Richards, and circumstantial evidence indicating that Red Elk had in his possession a gun similar to the murder weapon prior to the murder.

Forsyth contends that the State's misconduct in charging Gary Red Elk with accountability for the murder of Karen Forsyth denied him due process. Red Elk was arrested and charged one week before the second trial. Forsyth claims that the State deliberately brought the charges without probable cause to harass the defense.

There is little doubt that the misconduct Forsyth alleges here would, in the appropriate case, constitute a violation of the guarantee of a fair trial. However, we have reviewed the transcript from the preliminary hearing on probable cause to arrest Red Elk. The evidence from the hearing shows that probable cause existed. Thus, we affirm on this subissue.

In summary, we hold for the State on all three subissues. The decision of the lower court to allow the testimony is affirmed.

## III

In connection with issue 3, the relevant facts are as follows: Charlie Perkins testified at the third trial in regard to statements allegedly made by Forsyth while in prison after the first trial. According to Perkins, Forsyth confessed to torturing and murdering Karen Forsyth.

Forsyth contends that the lower court erred by allowing the prosecution to amend the information to add Charlie Perkins to the State's listed witnesses. The amendment came shortly after the State discovered in the middle of the third trial that Perkins would testify that Forsyth confessed to the murder. The lower court allowed Perkins to testify over the defense's objection that a mistrial should be granted. The motion for mistrial claimed that allowing Perkins to testify would result in; (1) prejudice insurmountable by a continuance, (2) improper disclosure of the verdict from Forsyth's first trial, (3) inability to voir dire the jurors concerning their attitudes towards prison inmates in general. These claims are made here on appeal. The State responds that: (1) the week continuance given to Forsyth to prepare to meet Perkins's testimony prevents Forsyth from claiming prejudice from surprise; (2) the prior verdict was not improperly disclosed; (3) the lower court's caution to counsel that the prior conviction might come up vilified Forsyth's right to voir dire jurors on inmate attitudes.

First, the statute to be applied once again is § 46-15-301(1), MCA (1983), which grants the District Court discretion to allow additions to the witness list. The prosecution's lack of knowledge of Perkins at the time of the arraignment constitutes good cause for not adding his name to the listed witnesses. The continuance granted Forsyth to meet the testimony mitigated surprise. Thus, the lower court acted within its discretion.

34

We are also swayed by the lack of support for Forsyth's contention that he had no opportunity to properly voir dire, and that disclosure of the prior conviction resulted in prejudice. The record reveals that prior to voir dire, the lower court cautioned Forsyth's counsel that the prior conviction might come out at trial. Forsyth's incarceration was relevant to Perkins's knowledge of the confession. Thus, Forsyth can claim no error in this regard.

Forsyth's inability to question prospective jurors on their attitudes toward inmates in general also fails. Amendments adding to the witness list after trial has started necessarily deprive the opposing party of the opportunity to voir dire prospective jurors with a particular "class" of witnesses in mind. Under the circumstances of this case, however, the denial of this opportunity is not so material that it gives rise to a claim for a new trial. Nor does it demonstrate abuse of discretion on the part of the trial court for allowing the witnesses from the particular "class" to testify. Thus, we affirm on this issue.

IV

In regard to issue 4, the relevant facts are as follows: Forsyth's first trial occurred in Flathead County. After reversal of the conviction in the first trial, the second trial occurred in Lake County. Following the mistrial of the second trial, the State moved to return venue to Flathead County, and proposed that the jury be composed of citizens from Toole County. The lower court granted this request over Forsyth's objections.

After the third trial the defense moved for a new trial on the grounds that trial publicity prejudiced the jury. The defense produced evidence purporting to show prejudice in the form of transcribed radio broadcasts aired during the trial.

35

The defense produced no evidence that the jurors heard the radio broadcasts.

Forsyth contends that the District Court erred by granting the State's motion for a change of venue from Lake County to Flathead County, with a jury selected from Toole County. The State responds that the trial court had discretion under § 46-13-203, MCA, to return the case to Flathead County. We agree.

The applicable part of the statute reads:

> If the court determines that there exists in the county in which the prosecution is pending such prejudice that a fair trial cannot be had, it shall:
>
> (a)  transfer the cause to any other court of competent jurisdiction in any county in which a fair trial may be had;
>
> (b)  direct that a jury be selected in any county where a fair trial may be had and then returned to the county where the prosecution is pending to try the case; or
>
> (c)  take any other action designed to insure that a fair trial may be had.

After the second trial the parties agreed that a new venue was necessary to insure a fair trial. The State's motion suggested that Flathead County could provide a fair forum if the jurors were selected from outside Flathead County and Lake County.

The result at first glance resembles an application of subsection (b), i.e., the option to select a jury from another county and return the case to the county where the prosecution is pending. However, in this case, after selection of the jury from Toole County, the cause did not return to Lake County, where it was most recently pending.

36

Instead, it returned to Flathead County, where the first trial occurred. Thus, technically, subsection (b) did not apply. Apparently recognizing that subsection (b) did not apply, the lower court specifically relied on subsection (c). We hold that the lower court acted within its discretion in applying subsection (c).

This Court will not:

> overturn a District Court order granting or denying a motion for change of venue unless such action is found to be arbitrary or capricious, or, in other words, an abuse of discretion.

State v. Beach (Mont. 1985), 705 P.2d 94, 102, 42 St.Rep. 1080, 1087.

The inquiry here is whether the District Court took action to insure a fair trial. This issue is primarily a question of fact. Beach, 705 P.2d at 102. In Beach we upheld the lower court's application of subsection (a) of the statute because the lower court properly balanced the competing considerations of cost and inconvenience to the prosecuting county, with the defendant's right to a fair trial. Beach, 705 P.2d at 102. The lower court in Beach also reserved the right to reconsider the defendant's objections to venue if voir dire showed prejudice. Beach, 705 P.2d at 102. Here, the State points out that the crime scene and most of the witnesses were located in Flathead County. The State also contends that there has been no showing of prejudice among the Toole County jury panel. We agree that Forsyth's contentions on prejudice among the jury panel fails. In regard to the jury itself, the lower court took actions to insure that they were insulated from prejudice within the community. Thus, we hold that the lower court properly balanced the considerations at issue in this case, and properly applied subsection (c).

37

Forsyth also contends that the Flathead venue provided an unfair forum because jurors were exposed to prejudicial radio broadcasts. After the jury verdict, Forsyth moved for a new trial based on the exposure. However, the lower court denied the motion holding that Forsyth failed to carry the burden of showing such exposure occurred. Forsyth offers nothing on appeal to controvert this ruling except an unsupported assertion that the burden to show a fair trial should be placed on the prosecution, and that the trial court failed to give the "defendant opportunity to complete the record". First, the record reveals that the lower court provided Forsyth an adequate opportunity to muster evidence for this claim, and second, the burden belongs properly on the defendant in this type of situation. State v. Kirkland (1979), 184 Mont. 229, 242, 602 P.2d 586, 594.

V

The relevant facts on issue 5 are as follows: Forsyth moved for a new trial on the grounds that evidence coming to light after the trial inferred that witnesses Charlie Perkins and Timothy Hiser testified in exchange for favors from the State. New evidence also revealed that presiding District Court Judge Michael D. Keedy corresponded with State's witness Hiser concerning Hiser's problems at prison prior to Hiser's testimony at Forsyth's third trial.

First, in regard to Perkins, the lower court properly denied a new trial to present evidence that Perkins wanted a transfer. New evidence which is merely cumulative or tending only to impeach does not provide grounds for a new trial. State v. Short (1985), 702 P.2d 979, 984, 42 St.Rep. 1026, 1032. Forsyth brought out Perkins's desire for a transfer at trial. There has been no showing that the transfer Perkins received after the trial was promised before trial. Thus,

38

the new evidence in regard to Perkins is both cumulative and tending only to impeach.

The same is true as to the new evidence concerning Hiser. There is no proof that officials promised Hiser an early release in exchange for his testimony, and the effect of the new evidence at trial would be only impeachment.

There is a further contention that the District Court Judge improperly failed to inform defense counsel that Hiser feared for his life while in prison prior to testifying for the State in the third trial. Hiser testified at the third trial that Forsyth and Forsyth's counsel spread rumors to endanger his life. The contention on appeal is that the District Court Judge should have disclosed Hiser's prior fears so that Forsyth could use the information to discredit Hiser. This, again is merely cumulative, tends only to impeach, and does not amount to grounds for a new trial.

VI

Issue 6 concerns attorney fees for Forsyth's counsel. Forsyth's counsel moved for attorney fees and necessary expenses on June 25, 1986. However, this motion had not been heard at the time that this appeal was made. Forsyth contends this Court should order the District Court to hear and determine the motion for fees and expenses. We agree. The District Court is hereby ordered to hear and determine the motion as soon as the needed information on the fees can be gathered, and as soon as the motion can be scheduled. We further order the District Court to include fees for this appeal in the determination on the motion.

VII

Issue 7 relates to Forsyth's sentence. The District Court Judge presiding over the first trial sentenced Forsyth

39

to 70 years for the murder. The sentencing judge after the verdict of the third trial sentenced Forsyth to 100 years, with an enhancement of 10 years for the use of a weapon.

Forsyth contends that the increase violates his due process rights. Forsyth also contends that the lower court violated his due process rights by enhancing his sentence by ten years for use of a dangerous weapon.

The State responds that objective identifiable evidence justified the increased sentence, and that this Court has rejected the contention made by Forsyth in regard to enhancement of sentences.

Due process guarantees resentencing free from vindictiveness stemming from reversal. As explained by the United States Supreme Court:

> Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.
>
> In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

40

North Carolina v. Pearce, (1969), 395 U.S. 711, 725-26, 89 S.Ct. 2072, 2080-81, 23 L.Ed.2d 656, 670-71.

Since _Pearce_, other United States Supreme Court cases have further explained this particular right:

> In _Wasman v. United States_, 468 U.S. 559, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984), the Supreme Court indicated that relevant conduct or events that occurred subsequent to the original sentencing proceedings are those that throw "new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.'" Id. 104 S.Ct. at 3225-26 (Powell, J. concurring), quoting _North Carolina v. Pearce_, 395 U.S. at 723, 89 S.Ct. at 2079. Due process bars an increased sentence where no intervening conduct or events justifies the increase, _United States v. Whitley_, 734 F.2d 994, 996 (4th Cir.1984), or where no objective information concerning petitioner's conduct or culpability justifying the increase has been received. _Texas v. McCullough_, ___ U.S. ___, 106 S.Ct. 976, 980-981, 89 L.Ed.2d 104 (1986).

Thompson v. Armontrout (W.D.Mo. 1986), 647 F.Supp. 1093, 1095. Thus, due process rights on resentencing create a presumption of vindictiveness when a sentence is increased on remand. However, where a different judge sentences upon retrial:

> it does not follow that the second sentencer would have any reason to have acted vindictively against the defendant. _Texas v. McCullough_ (1986), 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104; _Colten v. Kentucky_ (1972), 407 U.S. 104; 92 S.Ct. 1953, 32 L.Ed.2d 584.

Village of Lodi v. McMasters (Oh.App. 1986), 511 N.E.2d 123, 125.

In this case, the first sentencer, District Court Judge Robert Sykes, was replaced by District Court Judge Douglas Harkin for resentencing after the third trial. Thus, there

41

is no presumption of vindictiveness and the defense must show actual vindictiveness.  McMasters, 511 N.E.2d at 125. Forsyth has made no such showing.  Thus, we affirm as to the additions to Forsyth's sentence.

Forsyth also contends that due process requires notice and an opportunity to defend against enhancement of sentence for use of a weapon under § 46-18-221, MCA.  Forsyth cites Pearce and Specht v. Patterson (1967), 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326, for this proposition.  Pearce holds that a defendant may not be twice punished for the same crime.  Pearce, 395 U.S. at 718.  Specht held that invocation of Colorado's Sex Offender's Act constituted a "new charge leading to criminal punishment".  Specht, 386 U.S. at 610. However, § 46-18-221, MCA, "does not provide for a separate, substantive offense".  State v. Davison (1980), 188 Mont. 432, 445, 614 P.2d 489, 497.  Thus, the information is sufficient if it states that a firearm was used in the commission of the offense.  Davison, 614 P.2d at 497.  That is the case here, and we affirm on this contention.

Finally, in regard to the sentence, Forsyth complains that the lower court failed to give him credit for time served.  The lower court's Sentence reads:

> 4.   The Defendant is granted credit for time spent in presentence incarceration while awaiting the disposition of this matter.

We hold that the Sentence's "presentence incarceration", and the application of §§ 46-18-402 to -403, MCA, mandate credit for the time Forsyth has spent in jail and prison since charges were brought in this case.

_____
Justice

We Concur:

_L. A. Turnage_____
Chief Justice

_John Conway Harrison_____

_____

_L. C. Gulbrannson_____

_____

_____
Justices

43

Mr. Justice John C. Sheehy, dissenting:


SPEEDY TRIAL

I protest the way the majority has papered over the facts relating to the issue of speedy trial. The long and intolerable delay in bringing this defendant to a third trial is the direct result of the improper tactics of the prosecution, the intransigence of the District Court and the unwillingness of this Court, when requested, to face the issues and make a decision. Those factors which served to delay the third trial cannot all be laid at the feet of the defendant.

Forsyth was originally charged in the District Court of Flathead County, with deliberate homicide on January 28, 1980. His first trial was held in that county during March and April, 1980 and resulted in his conviction. We reversed in State v. Forsyth (1982), 197 Mont. 248, 642 P.2d 1035.

The District Court then determined that a fair trial could not be had in Flathead County and so the place of trial was changed to Lake County. Forsyth underwent a second trial commencing December 1, 1982, where a mistrial was ordered on January 2, 1983, because of a hung jury.

Up through the second trial, Forsyth had been represented by private counsel retained by him. The two trials apparently depleted his assets, and as an indigent person, he applied to the District Court for the appointment of his formerly retained counsel to represent him at county expense. The District Court refused, and proposed instead to require that Forsyth be represented by the Flathead County public defender. At some point in these proceedings, the two counsel, who had formerly been retained by Forsyth to defend him, offered to continue representing him in his defense and

to charge the county for their services at the rate paid by the county to its public defenders and to charge but for one attorney. Nonetheless, the District Court persisted in looking first to the public defenders and when conflict there showed, to another firm of attorneys who were completely without knowledge of the facts and defenses supplied to Forsyth's case. Even these counsel protested they had conflicts of interest and could not represent Forsyth.

The question of Forsyth's defense counsel required two petitions to this Court. His first petition here was denied on May 11, 1983, where we held that there was no showing sufficient to warrant supervisory control. When the District Court persisted in appointing defense counsel other than his retained counsel, Forsyth again petitioned this Court for a writ of supervisory control and on October 6, 1983, on the order of this Court, the writ was granted and Forsyth's present counsel were appointed at public expense.

Thus, the two petitions in this Court relating to the appointment of his counsel for a third trial were necessitated by the inexplicable refusal of the District Court judge to appoint, at the same expense to the county as a public defender, those attorneys most directly conversant with the case and who had obtained for Forsyth a reversal of his first conviction, and a hung jury on the second trial.

The appointment of counsel was not the only problem faced by Forsyth before the District Court. Forsyth made a demand, as was his right, for a transcript at public expense of the testimony and proceedings in the second trial. Section 3-5-604, MCA, provides that in a criminal case where the defendant is unable to pay for a transcript, it shall be furnished to him and paid for by the state. The District Court first limited the transcript which he would permit to that of defendant's testimony and the State's witnesses.

Although Forsyth made several motions for a full transcript, and included this problem as part of the writs which he was pursuing before this Court it was not until January 13, 1984, that the District Court ordered that he be supplied with the remainder of the transcript. Perhaps the majority can explain how defense counsel could properly prepare for the third trial without having available to them the full transcript of the second trial.

Again, the majority attribute this delay completely to the defendant.

I urge and insist that these two items of delay, brought about by the District Court itself, cannot be characterized as institutional delay to be weighed less heavily, or otherwise attributable to the defendant; for if the defendant must bear the brunt in a speedy trial computation in choosing between pursuing his legal rights to a fair defense or proceeding with ineffective counsel, improperly prepared, he is given no choice at all.

A third item which caused delay was the immoderate order of the District Court to change the place of trial from Lake County to Flathead County. The poisoned atmosphere that pervaded Flathead County was the reason that the trial had been changed to Lake County originally. True, a jury was imported from Toole County to Flathead County for the third trial. The task of the jury in Flathead County was like having a band of Gauls to choose who should win between the Christians and the lions before the packed Roman citizenry in the coliseum in the days of the Caesars.

The change of place of trial, the refusal of the District Court to dismiss on his jury tampering charge, and the denial of the District Court of his motion for dismissal for lack of speedy trial caused Forsyth to come to this Court again seeking a writ of supervisory control. His application

was filed here on September 24, 1984, 631 days after the mistrial caused by a hung jury in Lake County. A final decision on his application for writ did not come out of this Court until July 2, 1985. The further delay of 281 days can mostly be attributed to a mistake of law made by this Court. In its first opinion, issued January 3, 1985 (701 P.2d 1356), the majority held that the refusal of a district court to dismiss criminal charges on a double jeopardy claim did not warrant supervisory control, and that the remedy on a double jeopardy claim for a criminal defendant lay only in an appeal following his conviction or in a post-conviction proceeding. In other words, the majority held that even though he would be subjected to double jeopardy he must nevertheless go to trial a second time. When the majority was made aware of the holding of the United States Supreme Court in Abney v. United States (1977), 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651, it was forced to grant a rehearing. Thus, a final decision did not come on Forsyth's application until July 2, 1985. The writ was again refused.

In good conscience this Court cannot count against Forsyth a delay caused by the majority's mistake of law.

It is galling to read in the majority opinion that the trial delay was "mitigated by the presence of transcripts from the previous trials." In this case, the mistrial on the second trial occurred on January 2, 1983. The last volume of the transcript of the second trial was delivered to Forsyth on April 23, 1984, a delay itself of 476 days, most of it unnecessary. It was said in United States v. MacDonald (1978), 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18, that in applying Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, the possibility that the defense will be impaired is the most serious consideration, "because the inability of the defendant adequately to prepare this case

skews the fairness of the entire system." Wingo, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

## JURY TAMPERING

The majority opinion does not discuss the jury tampering issue, but it was a large factor in the efforts made by Forsyth between the second and third trials to obtain a dismissal on the ground of double jeopardy.

Without question, the court's bailiff during the second trial in Lake County made ten documented egregious comments to members of the jury adverse to Forsyth's case. The instances are outlined in my dissent found in 701 P.2d at 1359. Despite the baleful remarks of the bailiff, the majority denied Forsyth's double jeopardy claims because the remarks were not an act of the prosecution, because no conviction was obtained, and, incredibly because "in the present case, the comments could at most be construed as an attempt to assist the state in obtaining a conviction." 701 P.2d at 1356.

True, a conviction was not obtained; neither was an acquittal. Who is to say if left the jury untampered, an acquittal might not have been obtained?

I iterate this point to insist that a proper construction of the law in cases of jury tampering by a bailiff is not to be tested by the test applied to prosecutors, whether the bailiff was attempting to provoke a mistrial. We cannot know the bailiff's intent in this case. We can only know that his remarks to the jury were inexcusable, in violation of the bailiff's oath of office, were abhorrent to our sense of justice, and cannot be excused on the ground that the bailiff is only attempting "to assist the state in securing a conviction." Oregon v. Rathbun (1979), 287 Ore. 421, 600 P.2d 392.

CHANGE OF PLACE OF TRIAL

Because it may go unreported in the written opinions
that have evolved from this case, some mention should be made
of the jury climate in which the third trial in Flathead
County occurred.

The homicide of Karen Forsyth on December 11, 1979
became the subject of intense public discussion in Flathead
County. Spurred by pervasive and abrasive newspaper and
radio coverage, public sentiment was brought to a white heat
in that county. After the first trial, and the reversal of
the conviction by this Court, the defendant moved in the
District Court for a change of place of trial from Flathead
County. A survey of public opinion, and press clippings from
the date of the homicide until the defendant was sentenced in
May, 1980, convinced the then presiding district judge to
make findings of fact and a conclusion requiring the cause to
be transferred to Lake County before the second trial,
because a fair trial could not be had in Flathead County.

After the Lake County jury hung up in the second trial
and a mistrial was ordered, the State moved the District
Court for a change of place of trial from Lake County back to
Flathead County, requesting that the cause be tried in
Flathead County, either before a Flathead County jury or one
selected from another county and returned to Flathead County
for trial. The court in effect granted that motion. Thus,
the third trial was returned to Flathead County, the same
county, in which it had been earlier judicially determined
that defendant could not receive a fair trial.

The trial judge commented to the Toole County jury on
the first day of the third trial:

> I would note as you have seen already that there is
> considerable public interest in these proceedings
> and you can tell that if by no other reason than
> the presence of the news media representatives,

including a television camera, among other things. I want to say at the outset, that even though this controversy has generated a great deal of community interest in Flathead County, and even though as a result of this trial, to a certain extent this Court will probably be under the microscope of public scrutiny as well as the parties and their counsel . . .

The court went on to give the jury the usual cautionary instructions that they were not to be influenced by matters outside the testimony of the trial and the exhibits received. However cautioned, the jury members could not fail to perceive and perhaps to respond to the unremitting pressure for a conviction of the defendant.

Bands of women, sensing somehow that the case involved women's rights, made it their business to pack the courtroom, every one of the 41 court days of the third trial. Sandy Richards, testifying that Douglas Richards had admitted to her that he committed the homicide of Karen Forsyth and not the defendant, complained on the record of the laughter coming from the members of the audience during her testimony, from two different sections of the courtroom audience. Interruptions from the audience in the court proceedings during trial are reflected in the court transcript. Everyday, before the jury verdict was announced, prejudicial radio coverage of the trial proceedings was going out over the airwaves.

After the third trial, Forsyth filed a motion for a new trial and to supplement the record with respect to the prejudicial trial publicity adverse to the defendant. Defendant claimed that radio broadcasts to which the juror members were exposed contained biased, false and prejudicial statements. One of the jurors had written a post-trial article in the "Shelby Promoter," a newspaper published in Toole County, which article contained several of the radio

statements. The defendant caused to be issued and served a subpoena duces tecum upon the owner of the offending radio station. On the day of the hearing, the owner did not deign to appear, but sent one of his employees who sought to excuse not bringing the copies of broadcasts on the grounds the broadcast of all the news all over the world was too voluminous to bring to court. On the day of the hearing, the trial court ordered that the radio station provide at least one copy of the longest broadcast for each of the court days. Before adjourning the hearing, the District Court stated that the broadcast material would be placed in the record prior to the court's ruling on the motion for a new trial and the defense would be permitted to make its argument. That evening, copies of broadcasts of 27 of the 41 days were furnished to the trial judge. No further copies of the broadcast were supplied and no further hearing was set. Five days later, the District Court denied the motion for new trial without further argument or hearing.

Thus, the District Court gave the defendant no opportunity to complete the record with respect to the effect of the radio broadcasts on the jurors and now the majority condemns the defendant for failing to show such influence.

Even if we were not to consider the effect of the radio broadcasts, the transcript itself contains enough reference to the packed courtroom antics to assure us that the first district judge was correct in the first place in determining that in Flathead County the defendant could not receive a fair trial.

The majority now state that the District Court acted properly in changing the place of trial back to Flathead County because the District Court is empowered under § 46-13-203(3)(c), MCA, to "take any other action to ensure that a fair trial may be had." Flathead County was the least

possible of the 56 counties in Montana in which Forsyth could have received a fair trial. Not lost to the taxpayers of Flathead County, especially reminded by the press and radio, was the mounting cost to them of the prosecution and defense of Forsyth.

## ADDITION OF NEW WITNESSES

In mid-course of the State's case-in-chief in the third trial, the state moved to amend the information to add new witnesses not therefore disclosed to the defendant Forsyth.

The court permitted the amendment of the information and the subsequent testimony. Thus, Charlie Perkins and Timothy Hiser, prisoners in the Montana State Prison, were permitted to testify that Forsyth had made a jailhouse confession that he killed Karen while Forsyth was incarcerated after the first trial.

During the second trial of Forsyth, in Lake County, the jury had been permitted to know that Forsyth had been convicted of a homicide in the first trial in Flathead County. In preparation for a third trial, Forsyth and the District Court seemed in agreement that any knowledge of Forsyth's first conviction should be kept from the Toole County jury. Thus, voir dire of prospective jurors from Toole County was conducted without reference to the first conviction, nor any impression the jurors might have regarding a first conviction.

When the State proposed to amend the information to add the name of Charlie Perkins, Forsyth objected strenuously, pointing out Perkins' untrustworthiness, substantiated by some of the prison staff, and particularly objecting that his testimony would reveal to the jury the first conviction about which Forsyth had not an opportunity to voir dire the prospective jurors. The majority hold that the "denial of this opportunity is not so material that it gives rise to a

claim for a new trial." But see, State v. Doll (Mont. 1985), 692 P.2d 473, 42 St.Rep. 40.

In like manner, Timothy Hiser was also permitted to testify to a jailhouse confession.

With the amendment of the names of Perkins and Hiser, the issues in the District Court trial took off in all directions. Hearings were necessary to bring in prison officials and others respecting the characters of Perkins and Hiser. A search was made of the possibility of finding witnesses among the 135 prison inmates who might disprove the jailhouse confession (an impossible task). When permitted to testify, the prison inmates not only testified to the jailhouse confession, but claimed Forsyth committed other crimes, including wielding a shank while he was in prison (Perkins had in fact been disciplined in prison for carrying a shank, which is a knife-like object). Hiser testified that the defendant had made threats to kill the prosecutor, and that his counsel had threatened to reveal to other prisoners that he was an informer. This evidence of other crimes were not noticed pretrial to defendant (State v. Just (1980), 184 Mont. 262, 602 P.2d 957). Defendant's counsel, however, did not object to the evidence of other crimes.

Post-trial, Forsyth moved for new trial, including as grounds that Perkins and Hiser had been promised benefits for their testimony. The pretrial hearings had brought out evidence from the prison officials that Perkins under long-term sentences, had wanted to be transferred out of the Montana State Prison; that two states, Washington and Idaho, had refused his transfer; and that as far as the prison staff was concerned, they would make no other effort to get him transferred. Following the trial of Forsyth, Perkins was transferred to the Wyoming Prison; he never returned to the Montana State Prison following the trial.

Forsyth further learned post-trial that correspondence existed between Timothy Hiser and the district judge before the third trial in which Hiser complained of the conditions of the Montana State Prison. Although Hiser testified that he was promised nothing for his testimony, following the third Forsyth trial, he was kept in the Flathead County jail until the spring of 1986, when he was completely released from all incarceration though he had been given a five year sentence in 1985. Hiser also never returned to Montana State Prison. The District Court denied the motion for new trial on this ground without giving Forsyth an opportunity to develop further hearings as to what agreements, if any, existed between the State and the prisoners when their testimony was arranged.

The majority approves the District Court's denial of a new trial on this point by stating that the additional evidence would be merely cumulative impeaching evidence as to the prison witnesses. That ground understates the impact on the trial of the introduction of this kind of testimony, the distraction of the jurors of having to choose between the testimony of the accused defendant and the uncorroborated testimony of prison inmates who probably stood to benefit from their testimony, and the grinding-down effect of a prolonged trial that ensued from the amendment allowing these witnesses. Defendant's constitutional right to a fair trial is directly involved in this issue.

CUMULATIVE ERROR

I do not wish to belabor this dissent by additional comments upon the testimony of the mother of the homicide victim that Forsyth had urinated on the victim; the murder charge filed against Gary Red Elk; the change of testimony of Dr. Johnson; the withholding of the names of witnesses and exculpatory evidence by the State; and, a variety of other

errors and improprieties which made a farce out of the fair trial requirement in this case.

To sustain the conviction, the majority has had to resort to a litany of intonements about "burdens" on the defendant, that claimed errors are "arguable" and that no "prejudice" has resulted to the defendant Forsyth.

I am unable to be convinced that the errors and improprieties singly or in concert, did not contribute to Forsyth's conviction in the third trial beyond a reasonable doubt. Accordingly, as to those errors and improprieties, I would reverse and grant a new trial. However, because of the bailiff's baleful attempts to assist the prosecution to convict Forsyth in the second trial, I would find that the third trial constituted double jeopardy and order a reversal and dismissal of the case.

_____
Justice

Mr. Justice William E. Hunt, Sr., dissenting:

I concur in the foregoing dissent of Justice Sheehy.

_____
Justice